284 F.2d 127
 JAEGER MOTOR CAR COMPANY, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (two cases).
Anna JAEGER, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Anna JAEGER, Administratrix of the Estate of Anthony A. Jaeger, deceased, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Anna JAEGER, Administratrix of the Estate of Anthony A. Jaeger, deceased, and Anna Jaeger, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 12924-12928.
 United States Court of Appeals Seventh Circuit.
 November 16, 1960.
 
 Carl R. Becker, Milwaukee, Wis., for petitioners.
 Charles K. Rice, Asst. Atty. Gen., Sharon L. King, Lee A. Jackson, Attorneys, Tax Division, U. S. Department of Justice, Washington, D. C., for respondent.
 Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.
 KNOCH, Circuit Judge.
 
 
 1
 Anthony A. Jaeger and Anna Jaeger, husband and wife, filed individual income tax returns for the calendar years 1945, 1946 and 1947, and joint income tax returns for the calendar years 1948 through 1953. Anna Jaeger is involved only because of the joint returns which she filed with her husband. Jaeger Motor Car Company (hereinafter called "Motor Company" or "J.M.C."), a Wisconsin corporation, of which Mr. Jaeger was president and the majority stockholder,[1] filed income tax returns for the years 1945 through 1953.
 
 
 2
 These consolidated proceedings involved deficiencies and additions to tax as determined by the Commissioner of Internal Revenue. In large part the facts were stipulated. The Tax Court found that there were deficiencies in income taxes and deficiencies in additions to tax for the years 1945, 1946, 1947 and 1948. The petitioner sought review in this Court.
 
 
 3
 No issue is taken respecting the deficiency assessments against Jaeger Motor Car Company or Mr. Jaeger for 1946, 1947 or 1948. It is contended, however, that deficiency assessment for 1945 is barred by the Statute of Limitations, and that findings of fraudulent returns by Mr. Jaeger in 1945, 1947 and 1948, and by the Motor Company in 1945, 1946, 1947 and 1948, are erroneous and unsupported by the evidence.[2]
 
 
 4
 In his deficiency notices, the Commissioner determined unreported income by net worth computation.[3] The notices of deficiency for 1945 taxes were mailed to Mr. Jaeger and the Motor Company on December 29, 1954, and January 18, 1955, respectively. No consents extending the period of assessment were filed for the calendar year 1945. The petitioners, as indicated, contended that assessment of tax deficiencies for 1945 was barred by the Statute of Limitations. The Tax Court found that the three-year limitation was inapplicable here because a portion of the deficiency for each year, 1945 through 1948, was due to fraud with intent to evade tax.
 
 
 5
 Where a return is false and fraudulent, with intent to evade tax, assessment and collection of deficiency may be made at any time. Internal Revenue Code of 1939, § 276(a), 26 U.S.C.A. § 276 (a). Fraud is a question of fact. Determination of fraud must be supported by substantial evidence. Where there is substantial evidence to support the conclusion of the Tax Court, we may not substitute our judgment of the fact of fraud for that of the Tax Court. Helvering v. Kehoe, 1940, 309 U.S. 277, 279, 60 S.Ct. 549, 84 L.Ed. 751 and cases therein cited. Prokop v. Commissioner of Internal Revenue, 7 Cir., 1958, 254 F.2d 544, 555.
 
 
 6
 The petitioners argue that the Commissioner's net worth determination was accepted by the Tax Court, not because it was affirmatively proved accurate, but because petitioners were unable to demonstrate that it was wrong. The petitioners contend that the Tax Court thus committed error because in sustaining an imposition of the fraud penalty, the burden is upon the Commissioner to show fraud by clear and convincing evidence.
 
 
 7
 The Tax Court found numerous instances of discrepancies between the taxpayers' books and accounting records and the actual income received. This satisfied the Tax Court that the taxpayers' books and records were inaccurate and inadequate for determining the tax liability. Computation of income by the net worth method was, therefore, justified. Holland v. United States, 1954, 348 U.S. 121, 131, 75 S.Ct. 127, 99 L.Ed. 150; H. A. Hurley v. C. I. R., 1954, 22 T.C. 1256, 1261 affirmed 6 Cir., 1956, 233 F.2d 177.
 
 
 8
 Most of the items comprising the Commissioner's net worth computation were stipulated. One contested item was the cash on hand on December 31, 1944. The Commissioner introduced evidence to show that in 1926, when Mr. Jaeger opened his automobile dealership, his net worth was about $12,000, and that substantially all his cash was used to finance the dealership. He closed his personal checking and savings account. In his testimony, Mr. Jaeger said that he did not draw all his money out in 1926, that he left some money in the bank. He and his wife had no personal savings account from 1928 until May 11, 1943, and no personal checking account from 1928 until December 19, 1946. Mr. Jaeger maintained a checking account as a sole proprietorship under the name of Jaeger Motor Car Company from November 23, 1926 until December 4, 1934 when Jaeger Motor Car Company, the corporation, took over the dealership. The corporation had opened a checking account July 10, 1934, and maintained it thereafter.
 
 
 9
 The Tax Court found that when in its early years the business was in a weak cash position with repeated bank overdrafts, all Mr. Jaeger's available cash, including money borrowed by him, was placed in the business; and that he had no cash accumulation at the end of 1936. Mr. Jaeger had large outstanding loans in 1936 and the years immediately following.[4]
 
 
 10
 Mr. Jaeger, in April, 1952, at an informal conference with the Commissioner's investigators, stated that he had $5,000 cash at the end of 1944. Later in 1952, Mr. Jaeger's accountant submitted a statement in which cash on hand was estimated at $50,000, and then corrected to $56,000, for December 31, 1944. In another statement Mr. Jaeger placed the cash on hand at a figure of $35,000. In his petition to the Tax Court, he alleged it to be $51,000. In his testimony, he said at the trial, once that he did not know the figure, and another time that he estimated it at $35,000.
 
 
 11
 Mr. Jaeger offered several explanations of the source of this cash. He described it as accumulated from salary and earnings, in 1940 through 1945. When investigation negatived that assertion, he said he had cash on hand when he went into business in 1926 and had accumulated more cash since then. This was not consistent with his bank overdrafts and borrowing, or with his further testimony that his business was in need of money and that he had put all the cash he could obtain into his business. He also testified that from 1937 to 1945 all his business income, all his salary, and all other income, went into the Motor Company's checking account, and that anything he might have received would be shown in his personal account on the Motor Company's books. The books eliminate the possibility of a cash hoard accumulated in the manner described. Later Mr. Jaeger also alleged receipt of loans from his daughters, who had been small stockholders and employees of the Motor Company. His daughter Edna's affidavit alleged that she lent her father about $6,800 during the period 1941 through 1946. His daughter Wilma's affidavit alleged a loan of $3,000 during the years between 1931 and 1941. His daughter Clara testified to loans during the years 1941 to 1946.
 
 
 12
 At the trial, it was conceded that Edna did not lend her father any money during the years 1941 through 1946. Wilma was paid about $4,700 during the period 1931 through 1941, when she was on the Motor Company payroll. Clara's earnings for 1941 were about $1,100; for 1942 about $4,800, and an average of about $2,500 for 1943 through 1946.
 
 
 13
 None of these alleged loans, or payment thereon, were evidenced by any record. The Tax Court considered the demeanor of the daughters as witnesses and the pertinent evidence of their earnings, etc., and found that no cash in the form of loans from his daughters was in Mr. Jaeger's possession at the time immediately prior to or during the years in issue.
 
 
 14
 The Tax Court further found that Mr. Jaeger's major source of income from 1937 through 1944 was his salary from the Motor Company and his rents from his real estate holdings, which were primarily leased to the Motor Company. His salary and rental income were credited to his account on the Motor Company books, and his federal and state taxes, and substantial amounts of his personal living expenses were paid by the Motor Company's checks and charged to his personal account. Mr. Jaeger's major sources of cash from 1937 through 1944 were found to comprise about $16,500 in Motor Company checks, and about $1,700 in checks payable to Mrs. Jaeger and charged to Mr. Jaeger's account. Mr. and Mrs. Jaeger deposited $2,638.18 in a savings account in 1943 and 1944. The Tax Court found that Mr. Jaeger had about $18,200 in cash available during the years 1937 through 1944, out of which he made the above deposit. This left about $15,600 to pay his food bills and other personal expenses not covered by the Motor Company checks for the years 1937 through 1944.
 
 
 15
 The Tax Court found that Mr. Jaeger's cash on hand was as follows:
 
 
 16
 12/31/44 $ 500
 12/31/45 500
 12/31/46 2,500
 12/31/47 3,000
 12/31/48 3,000
 
 
 17
 There was evidence to support the Tax Court's finding that the cash on hand as of December 31, 1944, had been only $500. Thus on the basis of the net worth valuation, there was evidence of substantial unreported income in each of the years in issue.
 
 
 18
 The Commissioner contends that the petitioners stipulated that any unreported income of Mr. Jaeger or of the Motor Company was solely the result of unreported profits on sales of automobiles of the Motor Company.[5] The petitioners argue that this constitutes a misconstruction of the stipulation: that its purpose was only to limit the proof of sources of unreported income available to the Commissioner, and not to admit any source of unreported income. The interpretation placed on the stipulation by the Commissioner and by the Tax Court, however, was entirely reasonable in the light of the language used.
 
 
 19
 Our scrutiny of the record in this case discloses evidence that in 1945 and 1946, when automobile sales prices were regulated by the Office of Price Administration, sales were being made by the taxpayers at prices higher than allowed by OPA regulations. The books of the Motor Company did not always reflect the total sales prices. Mr. Jaeger testified at one point that $11,400, which he placed in his safety deposit box on January 2, 1946, the same day he opened it, was composed of unrecorded over-invoice cash payments. On further examination, he denied that these over-invoice payments were received in 1945, and asserted that they were all received in 1946. When Mr. Jaeger was reminded of the date in question — January 2, 1946 — his counsel then said that the witness was confused and Mr. Jaeger said that he now recollected that this money had been put into the box at different times, so that he had reached a total figure of $11,400 by 1949. At other times during the investigation and trial, Mr. Jaeger denied that the Motor Company ever received the over-invoice profits and further denied that he or the Motor Company received any over-invoice profits in 1947 or 1948. One of the salesmen testified that he himself had kept the overage on sales he had made, and that Mr. Jaeger had prohibited the practice in 1947 and 1948. In his initial examination as an adverse witness for the Commissioner, this same salesman witness had testified that he turned in, to Mr. Jaeger, all over-invoice money received by him. The issue of credibility was, of course, for the Tax Court which had the opportunity of seeing and hearing the witnesses.
 
 
 20
 Thus, there was substantial evidence, which, if believed, supported the Tax Court's finding that some portion of the understated income in the years in issue was secured through a continuing practice of over-invoice sales.
 
 
 21
 The stipulation of facts in this case included the following:
 
 
 22
 "25. During the year 1945 Jaeger Motor Car Company paid a fine to the office of Price Administration for violation of their regulations in the amount of $850.00 and deducted such amount on the Federal Corporation return filed by it for such year. Petitioner Jaeger Motor [sic] Company concedes that the adjustment disallowing as a deduction is a proper one."
 
 
 23
 The Tax Court referred to this OPA fine in its opinion. The petitioners then sought to reopen the case for submission of the record in connection with the aforementioned fine. They asserted that the full record would have shown the $850 to be a civil judgment entered on a stipulation made solely for the purpose of that case which related to overcharges in 1944, not in 1945, and that such overcharges were per invoice and not over-invoice. The documents made a part of the petitioners' Appendix in the case before us show that the Administrator of the Office of Price Administration had filed a complaint in the U. S. District Court, against Jaeger Motor Car Company, and, on stipulation between the parties, made on October 15, 1945, had recovered an agreed judgment of $850 on October 16, 1945, for violation of the OPA regulations. The judgment order in that case also restrained Jaeger Motor Car Company, its officers, agents, etc., from sales of automobiles in excess of the established maximum prices. The documents do not establish that the suit referred to overcharges in 1944, nor that these were per invoice overcharges. In any event, there was no showing that the record in the OPA case constituted newly discovered evidence. In the absence of some such justification for re-opening the case, we cannot regard the Tax Court's denial of the motion as error.
 
 
 24
 In 1946, 1947 and 1948, automobiles were billed to members of Mr. Jaeger's family. Although the family member never paid for the automobile, his personal account on the Motor Company books would be charged and then credited, sometimes the same day, to reflect payment when the automobile was ultimately sold. One reason offered for this practice was the need to show a low inventory on hand to prevent decrease in the Motor Company's allotment of new automobiles. However, one such automobile was billed to a family member several days after it had actually been sold to a customer of the Motor Company. In that instance, a cash profit in excess of $500 was concealed. The automobile trade-in on that same transaction was ultimately sold to another customer at a profit in excess of $700 which never appeared on the books of the Motor Company. The evidence supports the Tax Court's conclusion that the practice was devised to prevent the appearance of these profits on the Motor Company's books. The Tax Court found that the profits on such sales were income to the Motor Company, as there was no bona fide sale of the automobiles when they were charged to Mr. Jaeger's relatives. Testimony of some of the ultimate purchasers indicated that they purchased these automobiles on the Motor Company's premises and believed that they were dealing with the Motor Company, which, in at least one case, issued a warranty on the automobile. Salesmen witnesses indicated that they never checked to ascertain whether they were selling an automobile which was listed as part of the Motor Company's inventory or which was listed as belonging to a member of the Jaeger family.
 
 
 25
 On December 31, 1936, Mr. Jaeger entered into a one-year lease of his property at 1823 N. 27th Street, Milwaukee, Wisconsin, with the Motor Company as lessee, at $500 per month, the lessee to pay all real estate taxes and insurance, and to keep the premises in good repair except for reasonable use, accidental damage and the like. December 31, 1937, the Motor Company's directors authorized another lease, otherwise on the same terms, for $250 per month. No formal lease was executed. The Motor Company occupied the premises and paid $250 per month through 1939. In 1939, an addition to the building was paid for by the Motor Company and charged to Mr. Jaeger's personal account. In 1940, the directors authorized a monthly rental of $250 for January through March and $500 for the rest of the year. Still without formal lease, the Motor Company continued to pay $500 monthly, plus taxes and insurance premiums through the years in issue. Late in 1946, a builder was employed to correct the foundation and add a second floor to the main building. As the work progressed, bills totalling $16,867.56 were paid by Motor Company check and charged to Mr. Jaeger's personal account. On November 30, 1947, the charges of $16,867.56 were transferred from Mr. Jaeger's personal account to a Company account: "lease-holds and improvements." One of the salesman-stockholder witnesses testified that on May 6, 1947, Mr. Jaeger had promised not to increase the rent if the Motor Company would take over these liabilities. The Tax Court found that the lease, however, was terminable by either party on 30 days' notice at the end of any year. Mr. Jaeger testified that it was his understanding that he could terminate the lease at any time on 30 days' notice. Thus the controlling stockholder, Mr. Jaeger, had the power to regain possession of the improved property, and an asset paid for by the Motor Company was made available for Mr. Jaeger to take if he desired. Meanwhile the Motor Company had never declared a cash dividend although it had a substantial earned surplus.[6]
 
 
 26
 On December 8, 1947, the directors of the Motor Company met to consider a cash dividend. Mr. Jaeger's certified public accountant had written to warn of accumulation of surplus and the possibility of assessment on undistributed profits under the Internal Revenue Code of 1939, § 102, 26 U.S.C.A. § 102. Checks for dividends of $25,000 had already been made out and were noted on the Company books. The minutes show that the liability for adding a second story to the structure was transferred from Mr. Jaeger's personal account and assumed by the Motor Company. There was a controversy with the contractor as to part of the sum due. $10,867.56 was transferred from Mr. Jaeger's personal account and another $10,075.52 was earmarked for payment when the claim was settled. This sum was added to the "leaseholds and improvements" account. When the claim was settled on December 31, 1947, the "leaseholds and improvements" account was reduced to $3,575.52. At the meeting on December 8, 1947, $100,000 was earmarked for building expansion and remodeling, and another $100,000 was thought necessary for working capital. The directors therefore decided against a cash dividend for 1947. In the years from 1947 through 1951, the Motor Company paid in excess of $150,000 for improvements to Mr. Jaeger's realty.[7]
 
 
 27
 Several commercial offices were made available by the alterations, which the Motor Company sublet at $75 to $100 monthly, retaining the rents collected.
 
 
 28
 The Tax Court concluded that the improvements paid for by the Motor Company constituted dividend income to Mr. Jaeger in the years when made. With this we agree. A dividend may be made in cash or in property. Internal Revenue Code of 1939, § 115(a), 26 U.S. C.A. § 115(a). Disbursement of corporate earnings and profits may constitute dividend income to stockholders although no dividend has been formally declared, and such disbursement is not made proportionate to the holdings of the stockholders. Louis H. Zipp v. C. I. R., 1957, 28 T.C. 314, 329, affirmed 6 Cir., 1958, 259 F.2d 119, certiorari denied 359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 636; Paramount-Richards Theatres v. C. I. R., 5 Cir., 1946, 153 F.2d 602, 604.
 
 
 29
 The Jaeger Finance Company began operations May 1, 1946, to finance automobile sales to the Jaeger Motor Car Company's customers. The Finance Company accrued interest payable on obligations to Mr. and Mrs. Jaeger, in 1948 and 1949. These amounts were paid in 1950. The Finance Company had funds from which the Jaegers could have taken their interest as it accrued. There was sufficient evidence to support the Tax Court's finding that the accrued interest was constructively received by the Jaegers in the years it was accrued payable to them. C. I. R. v. Arnold, 1 Cir., 1945, 147 F.2d 23.
 
 
 30
 On July 14, 1941, Mr. Jaeger, individually, entered an agency agreement with Motors Insurance Company, which continued through the years in issue. The Insurance Company agreed to pay Mr. Jaeger a commission on all insurance business accepted from him. The policies were in fact sold by Mr. Jaeger and other employees of the Motor Company, under Mr. Jaeger's agency agreement. Mr. Jaeger assigned his right to the commissions to the Motor Company and the Finance Company, neither of which was a party to the agency agreement. It is conceded that under Wisconsin law, a corporation may not act as an insurance agent. Wisconsin Statutes, § 209.04.
 
 
 31
 The Tax Court properly held that the commissions were taxable income to Mr. Jaeger although he had made an anticipatory transfer of the income to the two companies. Lucas v. Earl, 1930, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731.
 
 
 32
 The Tax Court had before it evidence of substantial understatements of income; numerous over-invoice payments, and sales of automobiles purportedly, but not in fact, owned by Mr. Jaeger's relatives; all of which produced income which was not reported on the books or tax returns of the Motor Company or of Mr. Jaeger. There were a series of evasive, contradictory explanations presented to the Commissioner of Internal Revenue and to the Tax Court. There was sufficient evidence of a clear and convincing nature to justify the Tax Court's finding that Mr. Jaeger, and other officers of the Motor Company, were knowingly engaged in concealment of income from 1945 through 1948, and that fraud, with intent to evade tax, had been established with respect both to Mr. Jaeger and the Motor Company, for all four years. Davis v. C. I. R., 7 Cir., 1956, 239 F.2d 187, 191, certiorari denied 353 U.S. 984, 77 S.Ct. 1284, 1 L.Ed.2d 1143, and other cases therein cited. Therefore, the Statute of Limitations did not bar assessment of deficiencies for the year 1945.
 
 
 33
 It would unduly lengthen this opinion to no good purpose to discuss all the numerous facets of the case and all the points raised by the parties in their briefs and on oral argument. We have carefully considered each of these in arriving at our conclusion that the Tax Court's decisions should be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The stockholdings of the corporation at all times in issue prior to December 31, 1947, were as follows:
 Anthony A. Jaeger 203 shares
 Anna Jaeger 31 shares
 Clara Petrie (Kilbourn) 6 shares
 Wilma Petrie 5 shares
 Edna Jaeger 5 shares
 _____
 Total 250 shares
 On and after December 31, 1947, the stockholdings of JMC were as follows:
 Anthony A. Jaeger 812 shares
 Anna Jaeger 123 shares
 Clara Petrie (Kilbourn) 24 shares
 Wilma Petrie 20 shares
 Edna Jaeger 20 shares
 _____
 Total 1,000 shares
 
 
 [2]
 The contested issues as set up by the petitioners are:
 
 
 [1]
 The court's findings that Anthony filed false and fraudulent returns in the years 1945, 1947 and 1948 were erroneous and the findings are unsupported by clear or convincing evidence
 
 
 [2]
 The court's findings that J.M.C. filed false and fraudulent returns for the years 1945, 1946, 1947 and 1948 were erroneous and the findings are unsupported by clear and convincing evidence
 a. Court erred in denying motion to reopen and accept evidence of 1945 O.P.A. case and reconsider finding of fraud in 1945.
 
 
 [3]
 The assessment of tax deficiencies against Anthony and J.M.C. for the year 1945 is barred by the Statute of Limitations
 
 
 [4]
 The court finding that J.M.C. failed to report income from the sales of cars where the profit was retained by various members of the family in the year 1946 through 1948 in the amounts determined is erroneous; and his conclusion that said profit was attributable to J.M.C. was erroneous
 
 
 [5]
 The court's finding that "in at least eleven transactions during 1946 through 1948 cars were billed out to members of the family as a device for preventing profit on the subsequent sale being reported on company books" is erroneous and unsupported by clear and convincing evidence
 a. The Court's denial of petitioner's motion to strike respondent's Exh. FF and the testimony of Agent Schultz in relation thereto, was error.
 
 
 [6]
 Improvements to Anthony's property by J.M.C. as lessee, were leasehold improvements, subject to depreciation deduction by J.M.C., and did not constitute dividends to Anthony
 a. The uncontradicted evidence established that the appropriate rate of depreciation is a composite rate of 5% per annum.
 
 
 [7]
 Interest accrued payable to Jaeger Finance Corporation to Anthony and Anna was not taxable income to them until received by them in 1950
 
 
 [8]
 Insurance commissions assigned by Anthony to J.M.C. and J.F.C. were their income as reported by them, and not Anthony's income
 
 
 [3]
 In the deficiency notices the Commissioner determined by net worth computation that Anthony and the company had unreported income in the following amounts:
 1945 $10,115.14
 1946 20,252.98
 1947 20,090.56
 1948 18,476.33
 Minor changes in the above figures were made by the Commissioner in the amendments to his answers in the Tax Court.
 
 
 [4]
 The Tax Court found these to be as follows:
 1936 $27,847.16
 1937 40,980.97
 1938 30,480.97
 1939 25,180.97
 1940 30,430.97
 1941 8,900.00
 1942 5,900.00
 The loans were repaid by JMC and charged to Anthony's personal account.
 
 
 [5]
 The stipulation reads:
 "31. The issue of alleged unreported income of Jaeger Motor Car Company for the years 1945 to 1948, inclusive, results solely by reason of alleged unreported profits on sales of new and used automobiles.
 "32. The alleged unreported income of Anthony A. Jaeger is solely as a resuit of alleged unreported profits on the sales of new and used automobiles by Jaeger Motor Car Company which profit the said Anthony A. Jaeger allegedly diverted to his own uses and purposes."
 
 
 [6]
 The Tax Court found that the company's earned surplus, as reported on its income tax returns, was as follows:
 December 31, 1945 $ 44,341.53
 December 31, 1946 108,017.47
 December 31, 1947 198,758.19
 December 31, 1948 326,123.91
 December 31, 1949 394,283.99
 December 31, 1950 514,576.08
 December 31, 1951 555,491.35
 
 
 [7]
 The parties stipulated as follows:
 "1. That during the years 1947 to 1951, inclusive, Anthony A. Jaeger was the owner of certain property known as 1823-27 North 27 Street and 1835-49 North 27 Street, Milwaukee, Wisconsin. Jaeger Motor Car Company, during the years 1947 to 1951, inclusive, expended the following amounts for capital improvements to this property, a portion of which was allocated on the books and records of account of Jaeger Motor Car Company to the `leasehold improvements' account and a portion of which was allocated to the `building maintenance' account but which were in fact capital expenditures, as follows:
 Expended on Books but
 Year Capital Items on Books representing capital items Total
 ---------------------------------------------------------------------------
 1947 19,370.48 6,761.44 26,131.92
 1948 61,088.46 9,888.96 70,977.42
 1949 43,083.14 893.15 43,976.29
 1950 11,111.76 375.00 11,486.76
 1951 2,095.00 -- 2,095.00"