OLIVER L. BARDES AND OLIVE M. BARDES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ILSCO CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 75650, 75652. Filed March 26, 1962.

*Hugh C. Bickford, Esq., Henry H. Elliott, Esq.,* and *Nicholas Kapnistos, Esq.,* for the petitioners.

*Bart A. Brown, Jr., Esq.,* for the respondent.

ARUNDELL, *Judge:* In these consolidated proceedings the respondent determined deficiencies in income taxes as follows:

Oliver L. and Olive M. Bardes—Docket No. 75650

| Year | Deficiency |
|------|-----------|
| 1953 | $67,656.08 |
| 1954 | 1,763,134.87 |
| 1955 | 383,746.97 |
| 1956 | 492,510.13 |

Ilsco Corporation—Docket No. 75652

| 1954 | 269,580.94 |
|------|-----------|
| 1955 | 236,127.51 |
| 1956 | 70,815.57 |

In determining these deficiencies the respondent made numerous adjustments to the net income reported by petitioners in their returns. Most of these adjustments were assigned as error by petitioners. However, the parties have now settled by stipulations most of the errors assigned and effect will be given thereto in the recomputations to be made under Rule 50.

In Docket No. 75650 (the Bardes case) the only issues remaining are (1) whether petitioner Oliver L. Bardes realized dividend income in 1953, 1954, 1955, and 1956 as a result of expenditures made by the Bardes Corporation in those years in connection with construction of the Bardes building and an addition thereto in the respective amounts of $27,846.72, $58,094.30, $26,105.39, and $89,953.71, and in 1956 as a result of expenditures made by the Ilsco Corporation in that year in connection with construction of the Ilsco building in the amount of $78,280.26; and (2) whether depreciation is allowable to petitioner Oliver L. Bardes in 1954, 1955, and 1956 on any basis he had for his interest in the Bardes building, and in 1956 on any basis he had for his interest in the Ilsco building. The latter issue was affirmatively raised by the respondent in his amendment to answer filed May 24, 1961.

In Docket No. 75652 (the Ilsco Corporation case) the only remaining issue is whether the respondent erroneously disallowed as a deduction in the year 1956 amortization of leasehold expenses in the amount of $2,921.42 ($6,470.90 deducted and claimed by petitioner Ilsco Corporation, minus $3,549.48 now conceded by the respondent as allowable).

FINDINGS OF FACT.

Some of the facts were stipulated and they are incorporated herein.

*Docket No. 75650 (the Bardes case).*

Petitioners are individuals (husband and wife) who reside in Cincinnati, Ohio. They filed joint Federal income tax returns for the years here involved with the district director of internal revenue for the Cincinnati district. The returns were filed on the cash receipts and disbursements method.

The Bardes Corporation was, during the period here involved, a corporation formed by the father of petitioner Oliver L. Bardes (hereinafter sometimes referred to as Oliver), under the laws of the State of Ohio, on March 8, 1908. The stockholders thereof consisted of Oliver (57 percent), his wife, Olive (31 percent), and his two minor daughters Merrilyn and Mary (12 percent). Oliver was president and Oliver, his wife, and Raymond J. Kunkel were directors.

The Bardes Corporation was founded under the name of the E. H. Bardes Range and Foundry Company. Prior to 1949 the corporation was a jobbing foundry and was engaged in the manufacture of cast-iron stoves. During the 1940's the name of the corporation was changed to the Bardes Forge and Foundry Company and in the early 1950's the name was again changed to the present name, Bardes Corporation. In about 1949 the Bardes Corporation discontinued its foundry operations.

In 1946 the Cincinnati Elbow Company (hereinafter sometimes referred to as Elbow) was formed by Oliver and his brother-in-law, J. Richard Roe, to develop a machine for manufacturing galvanized metal elbows and to engage in the business of manufacturing such elbows. The operations of this company were originally carried on in a portion of the Bardes Forge and Foundry Company plant but later were moved to a building owned by Roe on Eastern Avenue in Cincinnati.

After Elbow moved into the Eastern Avenue plant, Roe wanted to get out of the company and to specialize in the production of another type of metals. After consideration by all concerned, Roe severed his connections with the company. From 1953 through 1956 the stock of Elbow was held as follows:

| Shareholder | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|
| Olive M. Bardes | 1,900 | 1,900 | 1,900 | 1,900 |
| Lee W. Gillespie | 100 | 100 | 100 | ----- |

Gillespie was president and Gillespie, Oliver, his wife, and Kunkel were directors.

Following termination of the connection of Roe with Elbow, efforts were made to find new space in which Elbow could carry on its operations. Originally, efforts were made to lease suitable space. These efforts were unsuccessful.

In 1952 Elbow found itself in a weak financial situation. Credit restrictions were placed upon it by its suppliers and, for it to obtain necessary materials for its operations, it became necessary for Oliver personally to guarantee its accounts. To remedy the situation, Elbow, on July 1, 1953, sold its machinery, equipment, and inventory to the Cincinnati Advertising Products Company (hereinafter sometimes referred to as Cincinnati Advertising), a corporation all of whose stock was owned by the Bardes Corporation. After this sale,

Cincinnati Advertising conducted the business of manufacturing galvanized metal elbows formerly carried on by Elbow, and Elbow confined its activities to operating as sales agent for this manufacturing operation of Cincinnati Advertising. On December 31, 1955, Cincinnati Advertising was dissolved and all of its assets were distributed to the Bardes Corporation in a complete liquidation. Thereafter, the Bardes Corporation carried on in its own name the manufacturing operation previously carried on by Cincinnati Advertising.

*Madison Road Property.*

On May 19, 1953, Oliver, as an individual, purchased from an unrelated party 12.5 acres of unimproved real estate zoned by the City of Cincinnati "light industrial," located at 4730 Madison Road in Cincinnati at a total cost of $50,000. This property is an irregular five-sided tract with 533.4 feet of frontage on the south on Madison Road.

Sometime prior to August 28, 1953, Oliver, on behalf of the Bardes Corporation, contacted Kruckemeyer & Strong, architects, in connection with the construction of a factory building on a portion (4.48 acres) of the property located at 4730 Madison Road. Preliminary plans for such a building were completed by Kruckemeyer & Strong on or about August 28, 1953. On or about September 30, 1953, Bardes Corporation executed an initial contract with Chas. V. Maescher & Co., Inc., for construction of part of the building designed by Kruckemeyer & Strong. Thereafter, the Bardes Corporation entered into a number of contracts for construction of various phases of this building. The building (hereinafter sometimes referred to as the Bardes building or as building A) was to be located on the rear 4.48 acres of the 12.5 acres located at 4730 Madison Road, purchased by Oliver on May 19, 1953. This 4.48 acres is a rectangular plot of 570 feet on the north and south (parallel to Madison Road) and 342 feet on the east and west. In September 1953, actual construction of the building was begun and, on June 1, 1954, the first portion of the building was occupied by the Bardes Corporation or its lessee.

At all times during the construction of the building referred to in the last paragraph, there existed a commitment between Oliver and the Bardes Corporation for Oliver to lease to the corporation the 4.48 acres of land on which the building was being built. The lease was to take effect as of the day of occupancy of the building.

On June 1, 1954, Oliver and the Bardes Corporation entered into an "Agreement of Lease" covering the 4.48-acre tract on which the Bardes building was being built. This lease, Joint Exhibit 4–D, is incorporated herein by reference, the material provisions being paraphrased and summarized as follows:

Lessor was Oliver. Lessee was Bardes Corporation. Term was for 10 full years from June 1, 1954, to May 31, 1964. Rental was $1,000 per annum. Lessee agreed to pay all taxes. Lessee agreed to construct on the premises a new one-story brick and concrete, cement floor manufacturing building to cost approximately $200,000. (Note: Building cost considerably more than $200,000.) Lessee agreed at all times to keep the building insured against loss by fire. Lessee agreed to deliver to lessor the land (4.48 acres) and building at the expiration of the term of lease. Lessee agreed that lessor reserved the right to make a 99-year lease of the premises or to sell the premises, provided that if the lessor so desired to do either of these, he "shall first offer said real estate to Lessee for such ninety-nine (99) year lease or for sale, at the price at which said real estate is being offered on the open market or at the price contained in a bona fide offer which Lessor has received in writing from a prospective Lessee or Purchaser of said real estate" (lease, par. 7.2).

Also, on June 1, 1954, the Bardes Corporation and Cincinnati Advertising entered into an "Agreement of Lease" whereby the Bardes Corporation leased to Cincinnati Advertising the entire building, including office space and grounds immediately adjacent thereto known and described as 4730 Madison Road, Cincinnati, Ohio, with the appurtenances thereto, for a term of 10 years, commencing June 1, 1954, at a rental of $2,500 per month.

On the same day, June 1, 1954, Cincinnati Advertising and Elbow entered into an "Agreement of Sub-Lease" whereby Cincinnati Advertising subleased to Elbow 300 square feet of office space in the office area of the same property described in the preceding paragraph with the appurtenances thereto, for a term of 10 years, commencing June 1, 1954, at a rental of $200 per month.

Beginning on June 1, 1954, the completed portions of the Bardes building were occupied by Cincinnati Advertising and Elbow in accordance with the terms of the above-mentioned leases.

Construction of the original portion of the Bardes building was completed in substance in January 1955. The building as completed had an area of 35,520 square feet of floorspace, of which 33,960 square feet was devoted to factory space and 1,560 square feet was devoted to office space.

Prior to January 1955, Oliver, on behalf of the Bardes Corporation, made arrangements for construction of a balcony over a portion of the Bardes building. Construction of this balcony was commenced in about January 1955 and was completed prior to the end of 1955. The area of this balcony space was 4,800 square feet.

In the years in question Oliver did not personally occupy any part of the Bardes building. The only money that he received in connection with the Madison Road property was the ground rental pro-

vided for in his "Agreement of Lease" and "Extension of Lease," mentioned later in these findings, with the Bardes Corporation and the only property rights or interest in the Bardes building which Oliver received during the years 1953 through 1956 were received by him under the terms of his lease and extension thereof with the Bardes Corporation.

### Docket No. 75652 (Ilsco Corporation).

Petitioner, Ilsco Corporation (hereinafter sometimes referred to as Ilsco), is a corporation organized under the laws of West Virginia on May 25, 1941, under the name Dunn Woolen Company. It filed Federal income tax returns for the calendar years 1954, 1955, and 1956 with the district director of internal revenue for the Cincinnati district.

On September 16, 1953, Oliver purchased all of the outstanding 5,000 shares of common stock (the only type of stock outstanding) of the Dunn Woolen Company for $405,182.64. This corporation, which had been in the textile manufacturing business in Martinsburg, West Virginia, ceased operations in October 1952 and disposed of all its machinery and equipment and other nonliquid assets, excluding real estate, on February 13, 1953. On the date Oliver purchased the 5,000 shares, September 16, 1953, the corporation sold its real estate (its only nonliquid asset) at book value to its former shareholders, which sale placed the corporation in a completely liquid condition. On April 10, 1954, the name of the corporation was changed to Dunn Corporation. On July 1, 1954, Oliver made three gifts of 500 shares each of the stock of Dunn Corporation to his wife and his two daughters, Merrilyn and Mary. No further change in stock ownership was made during the years here in question.

On September 28, 1954, the name of Dunn Corporation was changed to Ilsco Corporation.

Oliver was president of Ilsco from September 16, 1953, until October 8, 1954. Thereafter, through December 31, 1956, the directors and officers of Ilsco were as follows:

Andrew H. Stubbers, president.
E. J. Goggin, vice president.
Oliver L. Bardes, treasurer and director.
Raymond Kunkel, secretary and director.
Olive M. Bardes, director.
M. P. Regan, controller.

### Docket Nos. 75650 and 75652.

In 1954 Ilsco purchased the business and assets of the Ilsco Copper Tube & Products, Inc., including a factory building located on Mariemont Avenue in Mariemont, which is a suburb of Cincinnati. Such business consisted of making copper connecters for the electrical manufacturing industry, which business Ilsco conducted there-

after. The business of Ilsco expanded so that the separate plant of the corporation on Mariemont Avenue was inadequate. In addition, its best customer, Westinghouse Electric, wanted two sources of supply so that production would not be interrupted by fire or strike. Accordingly, the Bardes Corporation began to manufacture parts as subcontractor for Ilsco. In the fall of 1955, such manufacturing required additional space and the Bardes Corporation started construction of building B as an extension of the Madison Road plant. All plans, contracts, and expenditures were made by the Bardes Corporation in its own name and behalf. As construction of a portion of this addition was completed, such portion was occupied by the Bardes Corporation or its lessee. Building B was started in November 1955 and substantially completed in February 1957. It had an area when completed of 64,200 square feet of which 59,416 square feet was devoted to factory space and 4,784 square feet was devoted to office space. About 5,400 additional square feet of balcony space was added in 1956 and about 6,000 more square feet of balcony space was added in 1957. Building B was built adjacent to building A on the west side and, when considered with building A, formed an L-shaped structure.

As the manufacturing operations continued at the Madison Road buildings, it was found that the electrical manufacturing operations for Ilsco at building B resulted in costs of from 15 to 25 percent lower than costs at the Mariemont plant of Ilsco. Accordingly, in February 1957 Ilsco conveyed its inventory and machinery to the Bardes Corporation which thereafter carried on all the manufacturing activities, Ilsco becoming a sales organization, purchasing its products from the Bardes Corporation. Buildings A and B were used by the Bardes Corporation for substantial business purposes.

On August 24, 1956, Oliver and the Bardes Corporation executed a written document entitled "Extension of Lease" wherein the "Agreement of Lease" entered into by the parties on June 1, 1954, was extended for a period of 2 additional years, thus making the original lease expire on May 31, 1966, instead of May 31, 1964.

During the years 1953 to 1958, Bardes Corporation expended the following amounts for the construction of buildings A and B, trees, driveway, and parking:

| Year | Building A | Building B | Trees and driveway | Parking |
|---|---|---|---|---|
| 1953 | $96,738.83 | | | |
| 1954 | 192,580.89 | | $4,035.24 | |
| 1955 | 15,067.25 | $66,189.35 | | $3,586.85 |
| 1956 | | 342,147.17 | | |
| 1957 | | 108,449.82 | | 15,500.00 |
| 1958 | 25,442.43 | 1,568.50 | | |
| | 329,829.40 | 518,354.84 | 4,935.24 | 19,086.85 |

The Bardes Corporation capitalized the above cost of construction of buildings A and B in the amount of $848,184.24 on its books as "leasehold improvements" and is amortizing this cost over the 10-year period set out in the original lease and as extended to 12 years in 1956. On its income tax returns for the taxable years 1954 through 1956, the Bardes Corporation claimed amortization deductions of these "leasehold improvements" in the following amounts:

| Year | Claimed amortization deduction |
| --- | --- |
| 1954 | $16,876.98 |
| 1955 | 29,810.31 |
| 1956 | 41,287.00 |

Since June 1, 1954, the Bardes Corporation has paid all real estate taxes, insurance, and repair expenses for the Bardes building property. The following schedule reflects the amounts of real estate taxes and insurance paid by the corporation during the years 1954 through 1958:

| Year | Real estate taxes | Insurance |
| --- | --- | --- |
| 1954 | $901.64 | $262.40 |
| 1955 | 4,927.88 | 262.40 |
| 1956 | 5,622.16 | 480.94 |
| 1957 | 13,085.50 | 873.29 |
| 1958 | 13,085.50 | 679.58 |

Buildings A and B, when considered together as one structure, consist of a one-story L-shaped, well-constructed factory building containing some office space. The useful life of the building is 40 years.

The amounts claimed by the Bardes Corporation for amortization of the leasehold improvements (buildings A and B), plus the taxes, insurance, ground rent, and a hypothetical amount for interest return on the money invested in the improvements, represent the cost of occupancy to the Bardes Corporation of the Madison Road property. The average cost of occupancy for 1 year is as follows:

| | Building A | Building B | Total |
| --- | --- | --- | --- |
| Amortization | $25,365.58 | $43,065.55 | $68,431.13 |
| Taxes | 5,879.32 | 7,206.18 | 13,085.50 |
| Insurance | 327.11 | 400.94 | 728.05 |
| Interest | 6,087.74 | 10,335.73 | 16,423.47 |
| Ground rent | 449.30 | 550.70 | 1,000.00 |
| | 38,109.05 | 61,559.10 | 99,668.15 |

The fair rental value of buildings A and B in their completed state during the years here in question was in excess of $100,000.

Paragraph 12 of the stipulation of facts in Docket No. 75650 is as follows:

12. Respondent's investigating agent in this case, based on his examination, determined that the Bardes Corporation expended $88,332.39 in 1953 and $200,987.33 in 1954 in construction of the original building. Subsequent examination reveals that $96,738.83 was expended in 1953 and $192,580.89 in 1954. Respondent, in the notice of deficiency, has determined that the amounts expended by the Bardes Corporation on construction of this building and the building addition (as found by the agent) during the years 1953 through 1956 constitute dividend income to petitioners in the year of expenditure, which determination petitioners deny.

In a statement attached to the deficiency notice, the respondent explains the adjustment to income for the year 1953 as follows:

(b) It has been determined that the amount of $88,332.39, representing expenditures by the Bardes Corporation which corporation is controlled by you, during the year 1953 on the Construction of a Manufacturing plant on a tract of land owned by you, constituted a dividend as defined in Section 115(a) of the Internal Revenue Code of 1939, and therefore is includible in your gross income under Section 22(a) of the Internal Revenue Code of 1939.

Similar explanations were made for the adjustments to income of $200,987.33, $81,256.60, and $342,147.17 for the years 1954, 1955, and 1956, respectively. (Note: As will appear in the Opinion, respondent now claims that the amounts to be included as dividends on account of such improvements are not in excess of $27,846.72, $58,094.30, $26,105.39, and $89,953.71 for the respective years 1953 to 1956, inclusive.)

According to its books and records, the earnings and profits of the Bardes Corporation for its taxable years 1953 through 1956 and its accumulated earnings and profits as of December 31 of 1953, 1954, 1955, and 1956 were as follows:

| Year | Earnings and profits | Accumulated earnings and profits as of Dec. 31 |
|------|---------------------|------------------------------------------------|
| 1953 | ($39,708.40) | $563,008.78 |
| 1954 | 32,601.92 | 590,468.80 |
| 1955 | 197,723.77 | 960,440.49 |
| 1956 | 330,082.49 | 1,132,765.60 |

As a result of the improvements to the Madison Road property, Oliver received nothing in the taxable years which was the equivalent of cash and which was unqualifiedly subject to his demand and, accordingly, derived no income from such leasehold improvements.

### Glenway Avenue Property.

The Cook Well Strainer Company (hereinafter sometimes referred to as Cook Well) is an Ohio corporation whose stock in the year 1956 was owned 10 percent by Oliver and 90 percent by his two minor daughters. During 1956 Oliver was president and Oliver, his wife,

and Kunkel were directors. The corporation was, at all times relevant to these cases, engaged in the business of manufacturing and selling well strainers.

In 1955 Cook Well was carrying on its operations in a plant located on Beekman Street in Cincinnati and owned by Cincinnati Advertising. Due to a change in the Beekman Street neighborhood, Cincinnati Advertising decided to sell its Beekman Street property and, as a result, it was necessary for Cook Well to find a new site for its operations.

Because a number of the employees of Cook Well lived in Lawrenceburg, Indiana (some 15 miles west of Cincinnati), Oliver, as president of Cook Well, wanted to relocate the company in the extreme west end of Cincinnati in order to cut down the necessary travel to and from work of the Lawrenceburg employees. Marvin Fox, vice president of Cook Well, was commissioned by Oliver to attempt to locate a desirable site for the company in the west end of town. Fox inspected many properties and finally a tract of approximately 10 acres of unimproved real estate located at 6330 Glenway Avenue was decided upon as the most desirable location for the Cook Well plant.

On January 10, 1956, Oliver, as an individual, acquired the property located at 6330 Glenway Avenue from unrelated parties at a total cost of $32,500. This property consisted of approximately 7.5 acres zoned "light industrial" by Hamilton County and a rear 2.5 acres zoned "residential" by the City of Cheviot. The property is an irregular five-sided tract with 471.34 feet of frontage on the south on Glenway Avenue.

Prior to January 18, 1956, Oliver, on behalf of Ilsco, contacted Kruckemeyer & Strong, architects, for the purpose of having them design a factory building in which the manufacturing operations of itself and Cook Well could be carried on. Preliminary plans for such a building, to be located on a portion of the 6330 Glenway Avenue property owned by Oliver, were completed by Kruckemeyer & Strong in February 1956.

On February 15, 1956, Oliver and Ilsco entered into an "Agreement of Lease" covering the portion of the 6330 Glenway Avenue property fronting on Glenway Avenue and consisting of approximately 2.5 acres. This lease, Joint Exhibit 13–M in Docket No. 75650, and Joint Exhibit 1–A in Docket No. 75652, is incorporated herein by reference, the material provisions being paraphrased and summarized as follows:

Lessor was Oliver. Lessee was Ilsco Corporation. Term was for 12 full years from September 1, 1956, to August 31, 1968. Rental was $1,200 per annum. Lessee agreed to pay all taxes. Lessee agreed to construct on the premises a new one-story brick and concrete, cement floor manufacturing building to cost approximately $250,000. Lessee agreed at all times to keep the building insured against loss

by fire. Lessee agreed to deliver to lessor the premises, together with all improvements, at the expiration of the term of lease. Lessee agreed that lessor reserved the right to make a 99-year lease of the premises or to sell the premises, provided that if the lessor so desired to do either of these, he "shall first offer said real estate to Lessee for such ninety-nine (99) year lease or for sale, at the price at which said real estate is being offered on the open market or at the price contained in a bona fide offer which Lessor has received in writing from a prospective Lessee or Purchaser of said real estate" (lease, par. 7.2).

On February 16, 1956, Ilsco and Cook Well entered into an "Agreement of Sub-Lease" whereby Ilsco subleased to Cook Well a portion of the building to be built at 6330 Glenway Avenue (20,000 square feet more or less) for a term of 5 years from September 1, 1956, to August 31, 1961, at a rental of $12,000 per year. The original idea was that Ilsco would manufacture electrical connecters in part of the building and Cook Well would use the balance in its own business. It was later decided that it would be better to have Cook Well make the parts for Ilsco to avoid duplication and confusion. Accordingly, on June 7, 1957, the entire building was sublet to Cook Well for an annual rental of $26,400 from July 1, 1957, to June 30, 1962.

On or about March 14, 1956, Chas. V. Maescher & Co., Inc., submitted a bid to build a part of the building designed by Kruckemeyer & Strong on the front 2.5 acres of the property at 6330 Glenway Avenue. Thereafter, Ilsco entered into a contract with Maescher & Co., as well as numerous other contracts, for construction of this building (hereinafter sometimes referred to as the Ilsco building). Construction of the building was commenced on March 14, 1956. A portion of the building, consisting of approximately 19,800 square feet of floorspace, was occupied by Cook Well in late August 1956; the remaining portion was occupied by Ilsco. Construction of the building in substance was completed in January or February 1957. When completed, the building had a total inside area of 31,800 square feet of floorspace, of which 30,600 was devoted to factory space and 1,200 was devoted to office space. Since January or February 1957, no additions or changes to this building have been made.

Ilsco expended the amounts of $240,952.56 and $23,784.81 during the years 1956 and 1957, respectively, in connection with construction of the Ilsco building.

Ilsco capitalized the cost of construction of $264,737.37 of the Ilsco building on its books as "leasehold improvements" and is amortizing this cost over the 12-year period of its lease with Oliver. On its income tax return for the taxable year 1956, Ilsco claimed, for the last 4 months of 1956, an amortization deduction of these "leasehold improvements" in the amount of $6,470.90. Beginning in 1957, Ilsco

has claimed an amortization deduction in the amount of $19,412.70 on the 1956 "leasehold improvements."

Since February 15, 1956, Ilsco has paid all real estate taxes, insurance, and repairs on the Ilsco building property. The following schedule reflects the amounts of real estate taxes and insurance paid by Ilsco during the years 1956 through 1958:

| Year | Real estate taxes | Insurance |
|------|------------------:|----------:|
| 1956 | $61.50 | |
| 1957 | 3,324.29 | $666.52 |
| 1958 | 3,246.50 | 499.89 |

The Ilsco building as completed is a one-story L-shaped, well-constructed factory building containing some office space. The useful life of the building is 40 years.

Oliver did not occupy, in 1956 or at any other time, any part of the Ilsco building. The only money that he received in connection with the Ilsco building was the ground rental provided for in his "Agreement of Lease" with Ilsco and the only property rights or interests in the Ilsco building which Oliver received in 1956 were received by him under the terms of his lease with Ilsco.

The amounts claimed by Ilsco for amortization of the cost of the Ilsco building, plus the taxes, insurance, ground rent, and a hypothetical amount for interest return on the money invested in the improvements, represent the cost of occupancy to Ilsco of the Glenway Avenue property. The average cost of occupancy for 1 year is as follows:

| | |
|---|---:|
| Amortization | $22,061.45 |
| Taxes | 3,246.50 |
| Insurance | 499.89 |
| Interest | 5,294.75 |
| Ground rent | 1,200.00 |
| | 32,302.59 |

The fair rental value of the Ilsco building to Ilsco, a built-to-suit tenant, in the open market is $27,000 a year, plus taxes and insurance, assuming a nonrenewable 12-year lease.

In the notice of deficiency, respondent determined that Oliver realized dividend income in 1956 as a result of expenditures by Ilsco during such year in connection with construction of the Ilsco building in the amount of $240,952.56. At the hearing, respondent admitted that the amount of dividend income determined in the notice of deficiency to have been realized by Oliver in 1956 as a result of such expenditures was excessive and claimed that, of the amount determined in the notice of deficiency, only the amount of $78,280.26 was dividend income to Oliver in 1956.

According to its books and records, the earnings and profits of Ilsco for its taxable years 1954, 1955, and 1956 and its accumulated earnings and profits as of December 31 of 1954, 1955, 1956, and 1957 were as follows:

| Year | Earnings and profits | Accumulated earnings and profits as of Dec. 31 |
|------|---------------------|----------------------------------------------|
| 1954 | [1] $502,730.56 | $333,813.97 |
| 1955 | [1] 1,041,288.65 | 1,014,825.10 |
| 1956 | 839,841.08 | 1,421,017.39 |
| 1957 | | 1,458,722.49 |

[1] Before any net operating loss deduction.

As a result of the improvements to the Glenway Avenue property, Oliver received nothing in the taxable years which was the equivalent of cash and which was unqualifiedly subject to his demand and, accordingly, derived no income from such leasehold improvements.

Paragraph 9 of the stipulation of facts in Docket No. 75652 is as follows:

9. Petitioner [Ilsco] capitalized the cost of construction ($240,952.56) of the factory building set out above on its books as "leasehold improvements" and is amortizing the cost thereof over the terms set out in Joint Exhibit 1–A. On its income tax return for the taxable year 1956, petitioner claimed an amortization deduction on these "leasehold improvements" in the amount of $6,470.90. Respondent, in the notice of deficiency, has disallowed the claimed amortization deduction which disallowance petitioner opposes. If petitioner is entitled to amortize the amount of $240,952.56 over the term set out in Joint Exhibit 1–A, it is agreed that the amount of the amortization claimed for 1956 ($6,470.90) is the proper amount.

In a statement attached to the deficiency notice in Docket No. 75652, the respondent explained his disallowance of the $6,470.90 claimed by Ilsco as an amortization deduction in 1956 as follows:

(b) It has been determined that claimed deduction of $6,470.90 for leasehold amortization is not allowable, since it is based on expenditures on plant on Glenway Avenue, on which claimed amortization is based, which is held to have been for the benefit of Mr. Oliver L. Bardes, who controlled your Corporation, and therefore does not constitute an ordinary and necessary expense of your business.

The proper amount to be deducted for amortization by Ilsco Corporation in 1956 is the amount of $6,470.90.

### ULTIMATE FINDING OF FACT.

Expenditures of the Bardes and Ilsco Corporations in connection with the construction of the Bardes and Ilsco buildings were made pursuant to bona fide business transactions, all at arm's length.

OPINION.

The law applicable to these facts is clear and unmistakable. In 1938 the Supreme Court, in *M. E. Blatt Co.* v. *United States*, 305 U.S. 267, held that a lessor does not derive taxable income at the time of construction of leasehold improvements by the lessee because:

It may be assumed that, subject to the lease, lessor became owner of the improvements at the time they were made. But it had no right to use or dispose of them during the term. Mere acquisition of that sort did not amount to contemporaneous realization of gain within the meaning of the statute.

Two years later the Supreme Court, in *Helvering* v. *Bruun*, 309 U.S. 461, held that a lessor could derive income from the acquisition of the property upon the *termination* of the lease. Congress, however, immediately amended the law so as to *exclude* from the gross income of the lessor income attributable to improvements made by the lessee upon the termination of the lease. See section 115(a), Revenue Act of 1942, which amended section 22(b), I.R.C. 1939, by adding at the end thereof paragraph 11, so that the 1939 Code would read as set out in the margin.[1] The law was continued in section 109, I.R.C. 1954.[2]

It is obvious, therefore, that the respondent's determination, as set out in his notice of deficiency to the Bardes, that the total cost of the improvements made by the Bardes Corporation and by Ilsco became income to Oliver concurrently as the improvements were made, could not, in view of *M. E. Blatt Co.* v. *United States, supra,* be sustained and he now concedes that he erred in including the total cost of the improvements in dividend income. However, in an amendment to answer, second amendment to answer, and a granted motion for leave to amend answer to conform to proof, the respondent now contends that in lieu of the income determined in the notice of deficiency, Oliver derived dividend income in each of the years 1953 through 1956 from the Bardes Corporation of $27,846.72, $58,094.30, $26,105.39, and $89,953.71, respectively, and in 1956 from Ilsco of $78,280.26. The total of these amounts is approximately 30 percent of the total amount originally determined by the respondent as income from the leasehold improvements.

---

[1] SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\*　　　\*　　　\*　　　\*　　　\*　　　\*

(11) IMPROVEMENTS BY LESSEE ON LESSOR'S PROPERTY.—Income, other than rent, derived by a lessor of real property upon the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.

[2] SEC. 109. IMPROVEMENTS BY LESSEE ON LESSOR'S PROPERTY.

Gross income does not include income (other than rent) derived by a lessor of real property on the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.

In arriving at the above dividend income, now contended for, from the Bardes and Ilsco Corporations, the respondent offered testimony to the effect that the fair market value of the Bardes and Ilsco buildings at the termination of the respective leaseholds was $465,000 and $185,000, respectively. He then allocated those amounts to the years in which the improvements were made on the ratio that the improvements made in each of the years bore to the total improvements made, and then offered further testimony as to the present worth in each of the taxable years of the allocated portions due at the termination of the leaseholds.

The respondent bases his present contention on two major premises, (1) that the arrangements under which the Bardes and Ilsco Corporations constructed permanent improvements of a very substantial nature on properties leased by them from Oliver were not bona fide business transactions such as would be entered into by unrelated parties, and (2) that such expenditures made by the corporations in connection with the construction of these buildings bestowed upon Oliver direct ascertainable, economic benefits as these expenditures were made and that, therefore, Oliver realized dividend income as a result of these corporate expenditures in the years of expenditure.

We see no merit in the first premise. We think petitioners have clearly shown that all of the corporations here involved were bona fide business corporations and should be so regarded. The Bardes Corporation was organized by Oliver's father in 1908, long before the income tax amendment to the Constitution. Each of the other corporations was of like stature. Petitioners have also shown that the amounts claimed by the Bardes Corporation and by Ilsco for amortization of the leasehold improvements, plus the taxes, insurance, ground rent, and a hypothetical amount for interest return on the money invested in the improvements, represent the cost of occupancy to the corporations of the Madison Road and Glenway Avenue properties.

We think petitioners have shown that the cost of occupancy to the Bardes and Ilsco Corporations of the Bardes and Ilsco buildings of average annual amounts of $99,668.15 and $32,302.59, respectively, represented a fair rental value of what these corporations would have had to pay unrelated strangers for similar property on the open market.

As to the Bardes buildings A and B, petitioners offered the testimony of a real estate broker in Cincinnati who had handled over 500 sales or leases of industrial property in Cincinnati during the last 20 years. This witness testified that if the Bardes Corporation had rented comparable property from unrelated strangers in the open market during the years here involved, it would have had to pay an

annual rental of about $48,050 for building A and about $65,260 for building B, or a total of about $113,310 for the two buildings. Respondent offered the testimony of a real estate broker in Cincinnati who testified that in his opinion the rental value of buildings A and B at the time of completion would be about 85 cents a square foot, exclusive of the square feet of balcony space, which, together with the taxes and insurance, would amount to approximately $98,958 per year, or approximately the cost of occupancy to Bardes Corporation. We believe and have found from the evidence that the fair rental value of buildings A and B during the years here involved would have been an average of over $100,000 annually.

As to the Ilsco building, the parties stipulated that the fair rental value of that building during 1956 would have been about $27,000 a year, plus taxes and insurance, which would be approximately the same as the cost of occupancy to Ilsco Corporation.

It is, therefore, our opinion that, if the corporations had rented similar property in the open market from strangers, they could not have rented the property for any amount substantially less than the cost of occupancy to the corporation. We think this demonstrates that the expenditures made by Bardes Corporation and Ilsco were in fact and in substance made pursuant to bona fide business transactions, all at arm's length, and we have so found as an ultimate fact.

Regarding the second premise, we think it can be conceded that the expenditures of the corporations in connection with the construction of the Bardes and Ilsco buildings bestowed upon Oliver direct ascertainable, economic benefits as those expenditures were made. Similar assumptions were made by the Supreme Court in the *Blatt* case. But, as previously indicated herein, the Supreme Court, after making such assumptions, said: "Mere acquisition of that sort did not amount to contemporaneous realization of gain within the meaning of the statute."

Since we find no merit in either of the premises relied upon by the respondent, we hold that in accordance with section 22(b)(11), I.R.C. 1939, and section 109, I.R.C. 1954, petitioners, in Docket No. 75650 (the Bardes case), realized no income during the years 1953 through 1956 by reason of the improvements made to Oliver's properties by the Bardes and Ilsco Corporations. The case of *Jaeger Motor Car Co. v. Commissioner*, 284 F. 2d 127 (C.A. 7, 1960), certiorari denied 365 U.S. 860, affirming a Memorandum Opinion of this Court, is not in point.

The second issue in Docket No. 75650 (the Bardes case) was affirmatively raised by the respondent in his amendment to answer. The respondent, in his notice of deficiency to the Bardes, voluntarily allowed deductions in 1954, 1955, and 1956 for depreciation in the amounts

of $7,232.99, $9,264.41, and $19,826.02, respectively. Petitioners claimed no depreciation in their returns regarding the Bardes and Ilsco buildings and are claiming none now. In view of our holding on the first issue, we hold that the respondent erred in voluntarily making the above allowances. In the recomputations under Rule 50 they should be omitted.

In Docket No. 75652 (the Ilsco Corporation case), the only remaining issue is whether the respondent erred in disallowing amortization in 1956 of the improvements made on the Glenway Avenue property during 1956. Petitioner had claimed $6,470.90 which the respondent disallowed. It was stipulated that petitioner would be entitled to this deduction "If petitioner is entitled to amortize the amount of $240,-952.56 over the term" of the 12-year lease with Oliver.

In view of our holding on the first issue, we hold Ilsco Corporation is entitled to amortize the amount of $240,952.56 over the term of the lease. Sec. 162(a)(3), I.R.C. 1954; sec. 1.162–11(b), Income Tax Regs. *Fort Wharf Ice Co.*, 23 T.C. 202. It follows the respondent erred in disallowing the deduction claimed by petitioner in the amount of $6,470.90.

*Decisions will be entered under Rule 50.*