HUMAN ENGINEERING INSTITUTE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent JOSEPH S. KOPAS and MARY E. KOPAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Human Engineering Institute v. Commissioner
Docket Nos. 528-68, 529-68.
United States Tax Court
T.C. Memo 1978-145; 1978 Tax Ct. Memo LEXIS 373; 37 T.C.M. (CCH) 619; T.C.M. (RIA) 780145; April 13, 1978, Filed Joseph S. Kopas and Mary E. Kopas (officers), for the petitioner in docket No. 528-68 and pro se in docket No. 529-68. Buckley D. Sowards, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: These consolidated cases were assigned to and heard by Special Trial Judge Murray H. Falk pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. His report was filed and served upon the *375 parties on December 23, 1977. Subsequently, the petitioners filed exceptions thereto. Respondent filed no exceptions but did file a reply to petitioners' exceptions. Before we take action on the Special Trial Judge's report, we believe some observations are in order. This case has had a long and tortuous history, which has not been confined to proceedings before this Court. [1] Most of petitioners' efforts have involved unsuccessful challenges to the jeopardy assessments' validity -- a challenge which they again assert in their exceptions to the Special Trial Judge's report. At the trial before the Special Trial Judge, they renewed this attack, relying on Shapiro v. United States,424 U.S. 614 (1976), and Laing v. United States,423 U.S. 161 (1976). Neither of these cases offers petitioners any solace. Whatever the reach of Shapiro in respect of alleged arbitrary jeopardy assessments, this is a matter over which this Court has no jurisdiction, as the Supreme Court itself recognized. See 424 U.S. at 630, n. 12; California Associated Raisin Co. v. Commissioner,1 B.T.A. 1251 (1925). See also Durovic v. Commissioner,487 F. 2d 36, 40 (7th Cir. 1973). *376 Compare section 7429, Internal Revenue Code of 1954 (effective with respect to jeopardy assessments made after February 28, 1977). Laing decreed that a deficiency notice must be issued within 60 days after the making of a jeopardy assessment, a requirement that was satisfied in this case. [2] That case is, therefore, also inapplicable herein. A part of petitioners' attack on the jeopardy assessment (which is also *377 renewed in petitioners' exceptions) was for the purpose of obtaining the release of funds to pay counsel and accountants' fees. [3] This issue was thoroughly considered by this Court in Human Engineering Institute v. Commissioner,61 T.C. 61 (1973), and decided adversely to petitioners. In so ruling, the Court was fully aware of the burden placed on the trial court in relegating the potential constitutional issue to a post-trial determination. Consequently, as the record herein clearly reveals, the Court has made every effort to afford petitioners the maximum opportunity to present their evidence. Closely related to the problem of representation of petitioners is their complaint about the long period of time which this litigation has consumed. In the earlier *378 stages, it is clear from the record that the delays were largely attributable to actions by petitioners and their prior counsel, including the fact that petitioners themselves withdrew an offer in compromise before respondent had taken final action thereon. See Human Engineering Institute v. Commissioner,supra at 61-63. In the latter stages of these proceedings, much of the delay was due to the careful efforts by the Court to afford petitioners every opportunity to present their case (including making a deputy trial clerk available for three weeks in Cleveland, Ohio, to mark over 3,000 exhibits for identification). We also note that the record shows that petitioners, despite their protestations of lack of ability to defend themselves, exhibited considerable talent in their questioning of witnesses and their own testimony at the trial. Petitioners also assert that we should declare the deficiency notices void on the ground that they are arbitrary and unreasonable. This we have previously held we will not do; the most that we may do in the event that we find a deficiency notice arbitrary and unreasonable is to shift the burden of proof to respondent, [4] but *379 we have repeatedly indicated that we will take such a step only in the most extreme situations. See Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 328 (1974); Human Engineering Institute v. Commissioner,supra at 66 and cases cited thereat. Unfortunately for petitioners, the circumstances of this case do not, in our opinion, justify such action. Based upon our examination of the entire record, including the transcript and the deemed stipulated facts (see Strachan v. Commissioner,48 T.C. 335 (1967)), [5] coupled with petitioners' failure to submit any significant evidence in support of their position, [6] we cannot say that respondent's determinations were arbitrary and unreasonable. Compare Helvering v. Taylor,293 U.S. 507 (1935), the leading case on this point, where it was only after a full trial that the Supreme Court concluded that there was sufficient *380 evidence that the respondent's deficiency notice was without rational foundation and arbitrary. Against the foregoing background and after a thorough consideration of the entire record herein, the briefs of the parties, and petitioners' exceptions to the Special Trial Judge's report, we conclude and decide that the report, which is hereinafter set forth, should be adopted as the opinion of the Court. FINDINGS OF FACT AND OPINION OF THE SPECIAL TRIAL JUDGE FALK, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions thereto as follows: Petitioner Human Engineering Institute (Dkt. no. 528-68): Income Tax
Additions to Tax Under
sec. 293(b), Int.
sec. 6653(b), Int. Year
Deficiency
Rev. Code of 1939
Rev. Code of 1954
1953
$ 2,702.40
$1,351.20
1954
3,502.33
$ 1,751.17
1955
34,101.59
17,050.80
1956
44,641.08
22,320.54
1957
52,162.39
26,081.20
1958
8,914.62
4,457.31
1959
94,805.13
47,402.57
1960
212,990.70
106,495.35
1961
85,244.01
42,622.01
1962
124,164.55
62,082.28
*381 Petitioners Joseph S. Kopas and Mary E. Kopas (Dkt. no. 529-68): Income Tax
Additions to Tax Under
sec. 293(b), Int.
sec. 6653(b), Int. Year
Deficiency
Rev. Code of 1939
Rev. Code of 1954
1953
$ 23,627.16
$11,813.58
1954
20,621.60
$ 10,310.80
1955
67,920.07
33,960.04
1956
97,510.89
48,755.45
1957
144,922.26
72,461.13
1958
59,304.00
29,652.00
1959 249,487.78
124,743.89
1960
513,773.67
256,886.84
1961
261,048.97
130,524.49
1962
342,635.98
171,317.99
The following issues are presented for our decision: 1. Whether petitioner Human Engineering Institute failed to qualify as a tax exempt organization under section 101(6) of the Internal Revenue Code of 1939 for the year 1953 and under section 501(c)(3) Of the Internal Revenue Code of 1954[7] for each of the years 1954 through 1962, inclusive; 2. Whether the statute of limitations bars the assessment of a deficiency in respect of petitioner Human Engineering Institute for each of the years 1953 through 1962, inclusive; 3. Whether petitioner Human Engineering Institute had taxable income in the *382 amounts determined by respondent for each of the years 1953 through 1962, inclusive; 4. Whether petitioner Human Engineering Institute is liable for the 50 percent addition to tax for fraud for each of the years 1953 through 1962, inclusive; 5. Whether the statute of limitations bars the assessment of a deficiency in respect of petitioners Joseph S. Kopas and Mary E. Kopas for each of the years 1953 through 1962, inclusive; 6. Whether petitioners Joseph S. Kopas and Mary E. Kopas are liable for the 50 percent addition to tax for fraud for each of the years 1953 through 1962, inclusive; 7. Whether petitioners Joseph S. Kopas and Mary E. Kopas' gross income should be increased in the amounts determined by respondent for each of the years 1953 through 1962, inclusive; 8. Whether petitioners Joseph S. Kopas and Mary E. Kopas are entitled to deductions for business expenses, charitable contributions, interest, and taxes paid or incurred in excess of the amounts allowed by respondent for the years 1953 through 1962, inclusive; and 9. Whether petitioners Joseph S. Kopas and Mary E. Kopas are entitled to a dependency exemption deduction in respect of their son Robert for *383 the year 1961. FINDINGS OF FACT Pursuant to our Orders herein entered September 5, 1975, and September 23, 1975, in accordance with Rule 91(f), Tax Court Rules of Practice and Procedure, many of the facts are deemed to be stipulated. They and the exhibits referred to therein are incorporated in these findings of fact by this reference. Petitioner Human Engineering Institute (hereinafter sometimes referred to as HEI) is an Ohio corporation whose principal office was located in Cleveland, Ohio, at the time its petition was filed. Petitioners Joseph S. Kopas and Mary E. Kopas resided in Cleveland, Ohio at the time their petition was filed. At the time the deficiency notices were mailed to petitioners on November 3, 1967, the period for assessment of an income tax deficiency for each of the years in issue [8] against each of the petitioners had expired unless no return was filed for that year by the respective petitioners or they filed a fraudulent return. (See sec. 276(a), Int. Rev. Code of 1939, and secs. 6501(c)(3) and 6501(c)(1), Int. *384 Rev. Code of 1954.) Petitioners Joseph S. Kopas and Mary E. Kopas have been married since 1934. They had three children, Robert (born in 1938), Jacquelyne (born in 1941), and Edward (born in 1944). Petitioner Joseph S. Kopas (hereinafter sometimes referred to as Dr. Kopas) was born in Flushing, Ohio, on November 14, 1907. He graduated from Fenn College, Cleveland, Ohio, in 1931 with a bachelor of science degree in electrical engineering. In 1936, he received a master of science degree in vocational guidance and testing from Western Reserve University, Cleveland, Ohio. He received a Ph.D. degree in education from Ohio State University in 1959. Petitioner Mary E. Kopas (hereinafter sometimes referred to as Mrs. Kopas) was born in Hungary on February 22, 1907. She came to the United States at the age of five years, and became a naturalized citizen of the United States at about the age of 21 years. She graduated from Fenn College in 1949 with a bachelor's degree in business administration. She majored in accounting. Dr. Kopas caused petitioner Human Engineering Institute (HEI) to be incorporated as a corporation *385 not for profit under Ohio law on September 5, 1952, to conduct an educational institution. At all times relevant hereto, Dr. Kopas was HEI's president or executive director and Mrs. Kopas kept its financial books and records. HEI opened a bank account at the Central National Bank of Cleveland, Cleveland, Ohio, on August 31, 1953. On August 22, 1955, HEI filed with the Internal Revenue Service an application (signed by Dr. Opas) seeking exemption from federal income tax under section 501(c)(3). On November 22, 1957, the Internal Revenue Service denied the application. On February 18, 1960, it affirmed that denial after a requested reconsideration. On September 9, 1960, after a further requested reconsideration and the submission of new material, exemption was granted. HEI filed no income tax return or information return for 1953, 1954, or 1955. In December, 1960, it filed Forms 990-A (Return of Organization Exempt From Income Tax) for each of the years 1956 through 1959. For the years 1960, 1961, and 1962, it annually filed Forms 990-A with the District Director of Internal Revenue, Cleveland, Ohio. During each of the years involved here, Dr. Kopas operated a proprietorship *386 under the name of Personnel Test Company (hereinafter sometimes referred to as PTC) and maintained a bank account in the name of PTC at the Cleveland Trust Company, Cleveland, Ohio. In addition to Dr. Kopas, Mrs. Kopas had authority to draw on that account. Dr. and Mrs. Kopas had no other personal checking account during the years in question. On Schedule C (Profit (or Loss) From Business or Profession) for PTC attached to their federal income tax return (Form 1040) for each of the years in issue, petitioners Dr. and Mrs. Kopas reported gross receipts, cost of goods sold and business deductions, and net profit or loss as follows: Cost of Goods Sold
Net Profit
Gross Receipts
and Deductions
(or Loss)
1953
$4,384.33
8,993.19
($4,608.86)
1954
$3,321.00
7,761.09
($4,430.09)
1955
$18,050.00
20,036.60
($1,986.00)
1956
$22,684.00
22,601.90
$82.10 1957
$21,100.00
21,294.00
($194.90)
1958
$31,050.00
30,602.53
$447.47 1959
$11,550.00
10,684.38
$866.00 1960
$49,106.00
46,915.82
$2,190.00 1961
$15,966.00
34,256.00
($18,290.00)
1962
$4,893.00
17,063.00
($12,170.00) Deposits were made to the account maintained in *387 the name of Personnel Test Company at the Cleveland Trust Company for each year in the amounts set forth below: 1953
$56,507.52
1954
$28,567.42
1955
$92,868.90
1956
$88,544.49
1957
$118,101.14
1958
$102,390.70
1959
$162,085.19
1960
$177,969.95
1961
$262,041.82
1962
$245,491.94
Petitioner Human Engineering Institute (HEI) kept its books on the accrual method of accounting. For 1953, 1954, and 1955, HEI earned from Republic Steel Corporation $11,133, $19,811.20, and $108,454.76, respectively. For 1955, HEI also earned $2,100 from Industrial Information Institute, Inc. (hereinafter sometimes referred to as 4-I). For 1953, all of HEI's earnings from Republic Steel Corporation were deposited in HEI's account at the Central National Bank. For 1954, all but one check of Republic Steel Corporation were deposited in that account. The disposition of that one check -- for $875 -- is unknown. For 1955, two checks of Republic Steel Corporation were not deposited in that account. One of those -- for $3,246 -- was endorsed by Dr. Kopas as president of HEI and paid to the order of Richard Hawley Cutting & Associates, Inc. [9] The other Republic Steel Corporation *388 check -- for $30,000 -- was endorsed by Dr. Kopas as president of HEI and deposited in his account maintained in the name of PTC. Deposits of one check of Republic Steel Corporation, for $5,000, and one of 4-I, for $2,100, were credited on HEI's books to loans payable to PTC in 1955. In 1953, HEI issued two checks payable to the order of PTC, one, on September 7, for $2,000 and the other, on October 12, for $425, both of which were deposited in Dr. Kopas' account maintained in the name of PTC. In 1954, HEI issued four checks payable to PTC in the aggregate amount of $5,148.70. Three of those checks, in the aggregate amount of $4,359.70 were endorsed by Dr. Kopas and cashed at Central National Bank. The other -- for $789 -- was deposited in Dr. Kopas' account in the name of PTC. A check of HEI, in the amount of $962.40 made payable to another corporation in which Dr. Kopas had an interest, Management Personnel Corporation (hereinafter sometimes referred to as MPC), was endorsed by *389 Dr. Kopas, as president, and cashed. In addition, in 1954, HEI issued a check for $550 to Dr. Kopas. Dr. Kopas has been a numismatist since the 1930s and, in 1954, HEI issued checks in the aggregate amount of at least $3,281 in payment for gold and other coins purchased by Dr. Kopas. In 1955, in addition to the check of Republic Steel Corporation to HEI which Dr. Kopas endorsed and which was paid to the order of Richard Hawley Cutting & Associates, Inc. referred to above, HEI issued three checks totalling $8,500 (one to Mrs. Jean M. Cutting and two to Richard Hawley Cutting & Associates, Inc.) in part payment of the purchase price of real estate located at 2074 East 36th Street, Cleveland, Ohio, acquired by Dr. Kopas in the name of PTC.A check of HEI to MPC in the amount of $754 was also used in part payment of the purchase of that property. In 1961, respondent's agent, John H. Bender, who was then auditing Dr. and Mrs. Kopas' returns for 1958 through 1961, asked Dr. Kopas what the source was of the funds Dr. and Mrs. Kopas invested in real estate and Dr. Kopas told him they had various sources, such as redemption of "E" bonds, withdrawal of savings, various loans, and the sale *390 of coins. HEI issued one check to PTC in 1955 in the amount of $2,700. It issued a check for $2,148.32 in payment of the annual premium for a life insurance policy on Dr. Kopas' life, of which his estate was the named beneficiary, and four checks in the aggregate amount of $7,046.55 for the purchase of coins. On its returns (Forms 990-A) for 1956 through 1962, HEI reported receipts and expenditures as follows: Year
Receipts
Expenditures
1956
$187,667.50
$163,243.79
1957
$231,179.50
$232,957.17
1958
$152,676.12
$196,169.75
1959
$358,925.75
$280,181.52
1960
$573,685.34
$659,791.25
1961
$510,000.00
$549,551.16
1962
$588,914.14
$549,620.22
HEI failed to report income earned from 4-I in 1956 to the extent of $7,414.50. A check of 4-I payable to HEI, in the amount of $5,120, was endorsed by Dr. Kopas as president of HEI and used to pay for the purchase of coins from or through Federal Coin Exchange on February 25, 1956. Another check of 4-I payable to HEI, in the amount of $2,294.50, was deposited in HEI's account at Central National Bank, but reflected on HEI's books as part of a loan from Dr. Kopas in the amount of $2,300. In 1956, *391 HEI again paid the $2,148.32 annual premium on the Occidental Life Insurance Company of California life insurance policy on Dr. Kopas' life and owned by him. HEI paid $2,950 in 1956 for the purchase of a mortgage by Dr. Kopas. In addition to the 4-I check to HEI endorsed by Dr. Kopas and used to pay for coins, HEI checks were used to pay Michael Kolman Federal Coin Exchange) $8,360.50 in 1956 for coins purchased. A check of HEI to MPC in the amount of $1,175 was also used to pay Michael Kolman for coins purchased by Dr. Kopas. Two HEI checks, totalling $1,886, were issued to C. E. Charlton, an individual doing business as Canada Coin Exchange. In 1956, HEI also issued checks to Dr. Kopas totalling $8,466.80, Mrs. Kopas' sister ( $500), her father ( $750), and to PTC (totalling $8,224.80 in addition to amounts paid for rental, insurance, renovations, repairs, and improvements in respect of Dr. Kopas' property at 2074 East 36th Street). HEI did not report income received in 1957 from 4-I to the extent of $3,737.50. A 4-I check in that amount to HEI, in payment of an HEI invoice, was endorsed by Dr. Kopas as president of HEI and again as Personnel Test Co. HEI also failed *392 to report $527.85 interest income earned in 1957 on a savings account it opened in October of 1956. During 1957, Mrs. Kopas purchased property located at the corner of Niles Avenue and DeForest Road in Niles, Ohio, from Walter G. and Mary D. Marsh. The property was transferred by warranty deed dated October 4, 1957, and recorded in the Trumbull County deed registry on October 30, 1957. HEI issued three checks to Walter G. Marsh; on August 20, 1957 ($1,000) and October 22, 1957 ($3,300 and $3,820). The August 20 check, drawn on October 22, was charged to rent, and the $3,820 October 22 check was drawn on HEI's "plant and equipment fund" account. On October 22, 1957, HEI also issued two checks for $484.75 and $739 in payment for electrical work on that building. On December 2, 1957, HEI issued a check from its "plant and equipment fund" in the amount of $1,950 in payment for a heating system in the building. In 1957, HEI also issued checks to MPC ($14,782), to PTC ($3,100), to Dr. Kopas ($2,950), and to "cash" ( $278) which were deposited in Dr. Lopas' account maintained in the name of PTC. HEI also paid Stanley Appliance Company $236.85, a dentist $75, and Modern House $148.28 *393 for personal expenditures of Dr. and Mrs. Kopas. Another HEI check payable to MPC, this one in the amount of $3,640, was certified, endorsed for MPC by Dr. Kopas as president, and paid to Perera Company, Inc., a dealer in foreign currency. That check was charged on HEI's books with the explanation "600-3 inch notebooks, silk screened." Dr. Kopas purchased coins with HEI checks in the aggregate amount of $6,585.92 in 1957. HEI failed to report $5,175 of its income earned from Republic Steel Corporation in 1958. A payment by Republic Steel Corporation to HEI in that amount was entered on HEI's books, through a series of entries, as a deposit by and account payable to Dr. Kopas. In 1958, HEI made a further payment of $4,000 to Walter Marsh in part payment for the Niles, Ohio, property purchased by Mrs. Kopas in 1957. HEI paid $1,025 to a custom house broker for shipment of a Volkswagon car and truck from Portugal to Dr. Kopas and $946.66 for an insurance premium on farm property owned by Dr. Kopas in Massillon, Ohio. Dr. Kopas purchased coins with HEI funds of at least $4,800 in 1958. Two of HEI's checks payable to MPC, in the aggregate amount of $5,775, charged on HEI's books *394 to "supplies," were endorsed by Dr. Kopas as president and deposited to his account in the name of PTC at Cleveland Trust Company. For 1959, HEI failed to report $3,709.50 of its income earned from 4-I and $5,375 earned from Weirton Steel Company. One check of Weirton Steel Company, for $375, was deposited to PTC's account at the Cleveland Trust Company. In 1959, HEI issued checks to PTC in the aggregate amount of $11,550. It made another $4,000 payment to Walter Marsh for the Niles, Ohio, property purchased in 1957 by Mrs. Kopas. It paid $1,330.85 to the University of Notre Dame for the account of Dr. and Mrs. Kopas' son, Robert, who entered Notre Dame in September of 1958. HEI also issued two checks to MPC in 1959, in the aggregate amount of $6,525, which HEI charged on its books to "supplies" and which were not shown as sales on MPC's books but, rather, were credited to "accounts payable, J. S. Kopas." Dr. Kopas continued to deal in coins in 1959 and HEI checks were issued to coin dealers in the aggregate amount of $10,364.29 in that year. In 1960, HEI received $138,000 from Republic Steel Corporation for which HEI did not account on its books of account. One of three *395 checks of Republic Steel for $46,000 and another Republic Steel check for $875 were endorsed by Dr. Kopas as president of HEI and credited to his personal account with Ledogar-Horner Company, an investment securities firm. A 4-I check for $3,845, an individual's check for $50, and a check of Tyson Bearing Company for $350, all payable to HEI, were, similarly, all endorsed by Dr. Kopas and credited to his Ledogar-Horner account without being reflected on HEI's books. In all, HEI failed to report business income for 1960 to the extent of $152,484.79. In addition to deposition $6,132.50 of HEI's unreported income directly to Dr. Kopas' account in the name of PTC, HEI's own checks in the aggregate amount of $53,046 were deposited by Dr. Kopas in PTC's account in 1960, and $46,000 from HEI's "plant and equipment" savings account was transferred to the PTC's account without that transfer being reflected on the books of HEI. In 1960, HEI checks, charged on its books to "supplies" and "professional fees," were used to pay for clothes purchased from a shop on the Notre Dame campus by the Kopases' son, Robert, and for his tuition at Notre Dame. Another HEI check charged to "professional *396 fees" on its books was issued to Gonzaga University for application to the Kopases' daughter, Jacquelyne's, tuition. Three HEI checks to Walter Marsh, for $1,886, $868, and $1,246, respectively (a total of $4,000) -- all drawn within a 15-day period and paid on the same date -- paid the 1960 installment due on the Niles, Ohio, real property purchased by Mrs. Kopas in 1957. Those checks were charged on HEI's books to "professional fees." Another HEI check, this one payable to A. J. Moss, in the amount of $2,250, was charged to HEI's "professional fees" account and paid to Trader's Investment, Ltd., in part payment for Dr. Kopas' investment in a syndicate formed to explore mining property in British Columbia. HEI paid $80 for brunch chairs purchased by Mrs. Kopas and delivered to her home,$182 for home owners' insurance on the Kopases' residence, and $1,841.08 for the premium on a Northwestern Life Insurance Company policy on Dr. Kopas' life and owned by him. HEI funds in the aggregate amount of $7,706.30 were used to pay for coins purchased by Dr. Kopas in 1960. Dr. Kopas was an officer or director of the Holy Name Parish Credit Union and he served as a teller there from time *397 to time. On four occasions when he was working as a teller in 1960, HEI checks made payable to various nominal payees were deposited to accounts of Dr. and Mrs. Kopas and their children at the Holy Name Parish Credit Union. These five checks, in the aggregate amount of $6,372.66, were charged on HEI's books to "supplies" and "professional fees." For 1961, HEI received payments from Weirton Steel Company in the sum of $32,500, from 4-I in the sum of $5,935, from Eaton Manufacturing Company in the sum of $4,240, and from Tyson Bearing Company in the sum of $1,715 which were deposited in HEI's "plant and equipment" savings account but not reflected in HEI's sales journal or cash receipts journal. One check of 4-I, for $675, was endorsed by Dr. Kopas as president of HEI and deposited to his PTC account without being reflected on HEI's books. In 1961, HEI again paid the $2,148.32 annual premium on the Occidental Life Insurance Company policy on Dr. Kopas' life and owned by him. HEI funds were used to pay for a bedspread purchased by Mrs. Kopas, charged on HEI's books to "supplies"; a Zenith television set for the Kopases' son, Robert, charged to HEI's "advertising and promotion" *398 account; another of Robert's bills at Gilbert's Campus Shop at Notre Dame and two of his bills at the Notre Dame book store, all charged to "supplies"; and their son, Edward's tuition at St. Ignatius High School, charged to "professional fees." On four dates in 1961 when Dr. Kopas was acting as a teller at the Holy Name Parish Credit Union, HEI checks made payable to various nominal payees in the aggregate amount of $7,238 were deposited to Dr. and Mrs. Kopas' and their children's accounts at the Holy Name Parish Credit Union. For 1962, HEI failed to report income earned from Algoma Steel Corporation, Ltd. to the extent of $27,000, from 4-I to the extent of $15,103, and from Eaton Manufacturing Company to the extent of $8,812.50, as well as smaller amounts from others. In all, HEI failed to report business income in the sum of $60,234.74 for 1962. In 1962, Dr. Kopas withdrew $10,000 from HEI's "plant and equipment" savings account and the funds were deposited in HEI's checking account at Central National Bank and credited on HEI's books to "account payable, J. Kopas," with the explanation, "check on Republic not in -- J. Kopas borrowed to meet payroll * * *." An HEI check to *399 Walter Marsh in the amount of $3,880, charged on HEI's books to "supplies," was used in 1962 to make the final payment on the Niles, Ohio, real property purchased by Mrs. Kopas in 1957. Dr. Kopas purchased coins with HEI checks in the aggregate amount of $7,135.35 in 1962. Dr. Kopas made a capital investment of $3,865 in Federal Brand Enterprises, Inc. in 1962 using HEI funds charged on HEI's books to "supplies" and supported by a false invoice. Again, in 1962, personal expenses of the Kopases were paid by HEI checks -- to St. Ignatius High School for their son Edward's account and a box spring and mattress for their son Robert. Respondent determined that Dr. and Mrs. Kopas received income from HEI in the years and amounts as set forth below: 1953
$ 2,425.00
1954
10,351.70
1955
60,803.37
1956
44,955.09
1957
70,693.10
1958
40,187.50
1959
86,378.96
1960
483,201.67
1961
157,880.65
1962
135,067.14
Total
$1,091,944.18
On September 7, 1967, the Internal Revenue Service revoked, retroactively, its ruling of September 9, 1960, granting HEI exemption from income tax. On November 3, 1967, respondent issued a statutory notice of deficiency to HEI. *400 Respondent determined that HEI had income, allowable expenses, and taxable net income for 1953 through 1955, for which years HEI filed no returns, as follows: Allowable
Taxable Year
Income
expenses
income
1953
$11,133.00
$2,125.00
$9,008.00
1954
$20,361.20
$8,686.77
$11,674.43
1955
$111,809.76
$35,652.85
$76,156.91
Respondent also determined that adjustments should be made to HEI's income and expenses as reported on its Forms 990-A and that it had taxable income for the years 1956 through 1962 as follows: Nontaxable
income and
Additional
Disallowed
additional
Taxable Year
income
expenses
deductions
income
1956
$7,457.77
$65,811.90
$1,268.23
$96,425.15
1957
$4,687.85
$110,262.36
$2,283.33
$110,889.21
1958
$9,506.49
$65,031.70
$3,324.14
$27,720.42
1959
$11,357.09
$107,298.89
$4,505.72
$192,894.49
1960
$153,762.30
$358,405.73
$5,887.70
$420,174.42
1961
$51,261.43
$170,686.94
$7,889.49
$174,507.72
1962
$72,166.69
$147,608.82
$9,714.52
$249,354.91
Petitioners Joseph S. and Mary E. Kopas filed their joint federal income tax returns for 1953 through 1962 *401 in accordance with the cash receipts and disbursements method of accounting. For the years in issue, they reported their income to be as follows: Net rents &
Net cap. Year
Salary
Dividends [1]
Interest
Business [2]
royalties
gains [3]
1953
$15,735.36
$1,132.00
$248.00
($4,608.86)
$647.50 1954
$17,118.37
$1,024.50
($4,430.09)
1955
$18,066.37
$1,108.00
($1,986.60)
$1,552.22 1956
$19,126.00
$1,151.00
$82.10 1957
$20,586.60
$1,453.25
($194.90)
1958
$21,836.00
$ 793.50
$1,794.65
$447.47 ($1,000.00)
1959
$22,842.00
$1,414.00
$275.00
$866.00 $1,352.00 ($2,000.00)
1960
$29,083.00 [4]
$1,387.00
$302.60
$2,190.00 ($3,839.42)
($1,000.00)
1961
$48,456.00
$1,614.00
$6,579.39
($18,290.00)
$4,569.00 ($1,000.00)
1962
$50,107.00
$1,244.50
$5,182.00
($12,170.00)
$34.00 $171.00 Other
Adj. Gross
Year
income
income
1953
$13,154.00
1954
$13,712.78
1955
$18,740.00
1956
$20,359.00
1957
$21,834.95
$23,861.62
1959
$24,749.00
1960
$1,356.30
$30,479.00
1961
$41,928.00
$44,568.00
*402 In 1953, Dr. and Mrs. Kopas received interest from United States Treasury bonds (series E) in the amount of $1,963.60, whereas they reported only $66 of such income on their return for that year. Respondent determined that $35,244.54 of the funds deposited in 1953 in Dr. Kopas' account maintained in the name of PTC at the Cleveland Trust Company represented additional unreported income of Dr. and Mrs. Kopas for that year. In 1954, Dr. Kopas cashed certain checks of HEI made payable to PTC and Management Personnel Corporation (MPC) and used HEI funds to purchase coins. Funds of MPC were also disbursed to or on behalf of Dr. and Mrs. Kopas to the extent of $4,778.48 in 1954. Dr. Kopas received $9,236.40 from the sale of coins in 1954, which he did not report on his income tax return. In addition, respondent determined that $10,895.70 of the funds deposited in 1954 in Dr. Kopas' account which he maintained in the name of PTC at the Cleveland Trust Company represented unreported income of Dr. and Mrs. Kopas for that year. All in all, respondent determined that Dr. and Mrs. Kopas failed to report $27,638.34 of their income for 1954, plus unreported short-term capital gain of $9,236.40 *403 from the sale of coins. During 1955, Dr. and Mrs. Kopas received interest on United States bonds (series E) in the amount of $2,139.16, whereas they failed to report any interest income on their 1955 return. They received $5,930.85 from the sale of coins, which they did not report, also. For 1955, in addition to HEI's payments to and for the benefit of Dr. and Mrs. Kopas, MPC issued its checks for the purchase of coins by Dr. Kopas in the sum of $3,734 and paid rent to Dr. and Mrs. Kopas in the amount of $2,600. Respondent determined that Dr. and Mrs. Kopas failed to report income received in 1955 to the extent of $83,506.84, plus short-term capital gain from the sale of coins in the amount of $5,930.85. In 1956, HEI disbursed amounts to and for the benefit of Dr. and Mrs. Kopas; a MPC check in the sum of $7,155 was issued for the purchase of coins by Dr. Kopas; and a $2,050 payment was made by MPC for the purchase of a mortgage by Dr. Kopas. For 1956, Dr. and Mrs. Kopas failed to report rental income paid to PTC by Richard Hawley Cutting & Associates, Inc., in the amount of $2,925, and $171.24 interest earned on their joint savings account at the Holy Name Parish Credit *404 Union opened on January 3, 1955 ($10.01) and at the Central National Bank opened in 1956 ($161.23).They also failed to report $12,981.50 which Dr. Kopas realized from the sale of coins in 1956. Respondent determined that Dr. and Mrs. Kopas received $32,027.18 in net rental income in 1956 and that $8,571.15 of the funds deposited in 1956 in Dr. Kopas' account maintained in the name of PTC represented additional income of Dr. and Mrs. Kopas for that year. Respondent determined that, in all, Dr. and Mrs. Kopas failed to report $109,621.47 of their income for 1956, plus $12,981.50 short-term capital gain from the sale of coins. In 1957, in addition to 4-I's $3,737.50 check to HEI which was diverted to Dr. Kopas doing business as PTC, seven Republic Steel Corporation checks payable to MPC and in payment of MPC invoices, in the aggregate amount of $5,597.50, were deposited in Dr. Kopas' account maintained in the name of PTC at the Cleveland Trust Company. MPC checks in the aggregate amount of $964.50 were issued to T. L. Schnur, a New York coin dealer, in 1957. A MPC check in the amount of $2,098.50, charged on MPC's books to "purchases," was issued in payment for travel tickets from *405 New York to Paris to Lisbon purchased by Dr. Kopas. Dr. and Mrs. Kopas failed to report interest earned in 1957 on their joint savings accounts at the Central National Bank in the amount of $406.45, at Capital Bank (opened in 1957) in the amount of $195.67, and at the Holy Name Parish Credit Union in the amount of $20.17. They also failed to report $15,603.15 which they realized from the sale of coins that year. Respondent determined that Dr. and Mrs. Kopas received $14,881.22 in net rental income in 1957 and that $37,119.44 of construction expenditures made by Republic Steel Corporation for improvements to the property owned by Mrs. Kopas at the corner of Niles Avenue and DeForest Road in Niles, Ohio, constituted additional income to Dr. and Mrs. Kopas. Respondent determined that, in all, Dr. and Mrs. Kopas failed to report $162,194.09 of the income they received in 1957, plus short-term capital gain of $15,603.15 realized from the sale of coins. In 1958, in addition to HEI's funds used for Dr. and Mrs. Kopas' benefit, MPC checks were also used to purchase coins for Dr. Kopas. Dr. and Mrs. Kopas did not report on their 1958 federal income tax return interest earned on their *406 joint savings accounts at the Central National Bank ($130.58), Women's Federal Savings and Loan Association (opened in 1958) ( $140), Capital Bank ($152.92), and Security Federal Savings and Loan Association (opened in 1958) ($190.29). They did not report $356.65 realized from the sale of coins, also. Respondent determined that Dr. and Mrs. Kopas received $17,634.05 in net rental income in 1958 and that they failed to report a total of $62,284.23 of their income for that year, plus $356.65 short-term capital gain from the sale of coins and $832.82 long-term capital gain on Federal Intermediate Credit Bank Notes. In 1959, in addition to the sums disbursed by HEI to and for the benefit of Dr. and Mrs. Kopas, a check of MPC in the amount of $2,510 was used to pay for coins purchased by Dr. Kopas.Dr. and Mrs. Kopas failed to report interest income earned in 1959 on their joint savings accounts at Central National Bank ($4.19), Holy Name Parish Credit Union ($35.57), and Security Federal Savings and Loan Association ($290.49), and $1,000 interest they received from Michael Kolman on December 28, 1959. Dr. and Mrs. Kopas realized $10,097.55 from the sale of coins in 1959, which they *407 did not report. Respondent determined that Dr. and Mrs. Kopas received $35,431.23 in net rental income in 1959 and that $31,139.50 deposited in 1959 in a joint savings account in the names of Michael Kolman, Jr. and Joseph S. Kopas at Cleveland Trust Company, and $166.28 interest earned on that account in 1959, were income to Dr. Kopas. Respondent determined that Dr. and Mrs. Kopas received net rental income in 1959 in the amount of $35,431.23 more than they reported on their return for that year and that $115,273.13 of construction expenditures made by Republic Steel Corporation for improvements to property owned by Dr. Kopas in Glencoe, Alabama, and Massillon, Ohio, in 1959 represented additional income of Dr. Kopas for that year. Respondent determined that, in all, Dr. and Mrs. Kopas failed to report $291,886.66 of the income they received in 1959, plus $10,097.55 short-term capital gain realized from the sale of coins. In 1960, in addition to HEI's funds used for Dr. and Mrs. Kopas' benefit, a Republic Steel Corporation check for $1,463 payable to MPC in payment of a MPC invoice was endorsed by Dr. Kopas and deposited to his account maintained in the PTC; a check of MPC in *408 the amount of $1,707 was used to pay for coins purchased by Dr. Kopas; and, on two occasions in 1960 when Dr. Kopas was working as a teller at the Holy Name Parish Credit Union, a MPC check payable to a nominal payee was deposited to the accounts of Dr. and Mrs. Kopas and their children at the Holy Name Parish Credit Union. These last mentioned two checks, in the aggregate amount of $2,065.50, were charged on MPC's books to "purchases." Another MPC check payable to a nominal payee, this one for $1,010, was deposited to Dr. and Mrs. Kopas' joint account at the Holy Name Parish Credit Union on another occasion in 1960. Dr. and Mrs. Kopas did not report as interest income on their 1960 federal income tax return interest earned on their joint savings accounts at the Central National Bank ($4.71) or the Security Federal Savings and Loan Association ($322.78). Dr. and Mrs. Kopas realized $11,685.40 from the sale of coins that year, which they did not report, also. Respondent determined that Dr. and Mrs. Kopas received $40,719.37 more in rental income in 1960 than they reported on their return for that year and that they failed to report their income for that year in the aggregate amount *409 of $541,245.62, plus $11,685.40 short-term capital gain from the sale of coins and $60 wages from the Holy Name Parish Credit Union. In 1961, in addition to HEI's funds disbursed to and for the benefit of Dr. and Mrs. Kopas, MPC funds in the amount of $1,500 were used to pay for the purchase of coins by Dr. Kopas and charged on MPC's books to "purchases." For 1961, Dr. and Mrs. Kopas failed to report interest earned on their joint savings accounts at the Central National Bank ($167.30), Security Federal Savings and Loan Association ($316.77) and from United States Treasury bonds (series E) ( $64). They also failed to report $1,059.00 realized from the sale of coins in 1961. Respondent determined that Dr. and Mrs. Kopas received net rental income in the amount of $50,896.83 more than they reported on their return for that year and that $50,830.97 of the funds deposited in 1961 in the various bank accounts controlled by Dr. and Mrs. Kopas represented unreported income to them for that year. Respondent determined that, in all, Dr. and Mrs. Kopas failed to report $273,623.97 of their income for 1961, plus $1,059 short-term capital gain from the sale of coins and $1,030.20 long-term *410 capital gain from U.S. Treasury bills. Respondent also determined that $6,650 reported on Dr. and Mrs. Kopas' 1961 return as long-term capital gain from a patent license agreement was ordinary income. In 1962, in addition to HEI's funds used for Dr. and Mrs. Kopas' benefit, MPC funds in the amounts of $2,150 and $1,695.20, respectively, were used to pay for coins purchased by Dr. Kopas and for a capital contribution by Dr. Kopas to another corporation. Both payments were charged on MPC's books to "purchases." In 1962, Dr. and Mrs. Kopas failed to report interest received from United States Treasury bonds (series E) in the amount of $2,596.73; on their joint savings accounts at Holy Name Parish Credit Union ($458.01), Central National Bank ($33.35), Citizens Bank and Trust Company (opened in 1961) ($317.96), and Security Federal Savings and Loan Association ($162.34); and on the accounts in Dr. Kopas' and his children's joint names at Third Federal Savings and Loan Association (opened in 1962) ($42.78). The Kopases realized $7,891 from the sale of coins that year, which was also not reported. Respondent determined that Dr. and Mrs. Kopas received $62,567.68 more in rental income *411 in 1962 than they reported on their return for that year and that $84,788.63 deposited in 1962 in a joint bank account in the names of Michael Kolman, Jr. and Dr. Joseph Kopas at Cleveland Trust Company and another $58,923.26 deposited in 1962 in various other bank accounts controlled by Dr. and Mrs. Kopas represented unreported income to them for that year. Respondent determined that, in all, Dr. and Mrs. Kopas failed to report $366,142 of their income for 1962, plus $12,193.25 net capital gains. As with regard to 1961, respondent also determined that $8,317 reported in 1962 as long-term capital gain from a license agreement was ordinary income. Respondent disallowed as unsubstantiated business expenses and itemized personal deductions claimed on Dr. and Mrs. Kopas' returns for the years and in the amounts shown below: Disallowed
Disallowed Year
business expenses
itemized deductions
1953
$8,111.19
$1,118.00
1954
$6,869.09
$1,549.27
1955
$19,154.60
$744.00
1956
$21,718.90
$1,753.00
1957
$20,412.00
$1,737.00
1958
$29,720.53
$3,894.17
1959
$9,802.38
$1,675.34
1960
$46,033.82
$5,013.99
1961
$33,375.00
$5,883.53
1962
$17,063.00
$6,273.00
*412 Respondent also disallowed Dr. and Mrs. Kopas' claimed dividend exclusion for 1958 to the extent of $60 and their claimed dependency exemption deduction in the amount of $600 in respect of their son Robert for 1961. On January 23, 1969, petitioner Joseph S. Kopas, upon his plea of guilty, was convicted of having willfully and knowingly attempted to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1961 by filing a false and fraudulent income tax return. OPINION Issue 1. Tax-exempt status of Human Engineering Institute
9n relevant part, section 101 n(6) of the Internal Revenue Code of 1939 and section 501(c)(3) of the Internal Revenue Code of 1954, as applicable to the years in question, define as tax-exempt organizations: Corporations * * * organized and operated exclusively for religious, charitable, scientific, * * * or educational purposes * * *, no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *. The facts of this case clearly establish that HEI was operated, if not organized, for, inter alia, a commercial purpose, *413 i.e., the pecuniary benefit of petitioners Joseph S. Kopas and Mary E. Kopas and, further, that part of its net earnings inured to their benefit. In each of the years in issue, HEI funds were disbursed to or for the benefit of Dr. and Mrs. Kopas and deposits of HEI funds were made to Dr. Kopas' bank account which he maintained in the name of Peronnel Test Company (PTC).In each of the years 1954 through 1962, HEI funds were also used to pay for coins purchased by Dr. Kopas, real estate purchased by Dr. and Mrs. Kopas, life insurance premiums on policies insuring Dr. Kopas' life and owned by him, a mortgage purchased by Dr. Kopas, or other personal expenses of Dr. and Mrs. Kopas and their family members, or a combination thereof. Petitioners have given no satisfactory explanation regarding the payment of those funds. [10] "Not only can these payments, in the absence of explanation, be properly attributable to the individuals as income, but the logical inference can be drawn that these payments were disguised and unjustified distributions of * * * earnings." Founding Church of Scientology v. United States,188 Ct. Cl. 490, 498-499, 412 F.2d 1197, 1201 (1969), cert. *414 denied 397 U.S. 1009 (1970). [Citations omitted.] Even if the extent of the benefit to Dr. and Mrs. Kopas might be characterized as relatively small in one or two of the earliest years before us, petitioners have not suggested that it was deminimis, and we cannot find from the evidence presented that it was. When Congress conditioned the exemption upon "no part" of the earnings being of benfit to a private individual, it specifically intended that the amount or extent of benefit should not be controlling. Founding Church of Scientology v. United States,supra,188 Ct. Cl. at 500, 412 F.2d at 1202. Applying the facts here to the statute and in the light of the decided cases, we must conclude that HEI was not a tax-exempt corporation for any of the years before us, see, e.g., Founding Church of Scientology v. United States,supra;Birmingham Business College, Inc. v. Commissioner,276 F.2d 476 (5th Cir. 1960), and that respondent properly retroactively revoked his earlier determination *415 to the contrary, see, e.g., Automobile Club v. Commissioner,353 U.S. 180, 183-185 (1957); Stevens Bros. Foundation, Inc. v. Commissioner,324 F.2d 633 (8th Cir. 1963), cert. denied 376 U.S. 969 (1964). Issue 2. Statute of limitations on assessments against Human Engineering Institute
Having failed to file a return for any of the years 1953, 1954, and 1955, assessment of the tax against HEI for each of those years may be made at any time. Sec. 276(a) Int. Rev. Code of 1939 and sec. 6501(c)(3) Int. Rev. Code of 1954. As for each of the years 1956 through 1962, inclusive, assessment against HEI may also be made at any time if HEI filed a false or fraudulent return with the intent to evade tax for that year. The existence of fraud is a question of fact which must be ascertained by an evaluation of all the facts of the case. Stone v. Commissioner,56 T.C. 213, 224 (1971); see Drieborg v. Commissioner,225 F.2d 216 (6th Cir. 1955).The burden is on the respondent to prove the existence of fraud by clear and convincing evidence. Sec. 7454(a); Drieborg v. Commissioner,supra at 218; *416 Rogers v. Commissioner,111 F.2d 987, 989 (6th Cir. 1940). Moreover, respondent must make the required showing with respect to each year in question, because "proof of fraud for one year will not sustain the respondent's burden of proving fraud in another year." McLaughlin v. Commissioner,29 B.T.A. 247, 249 (1933). Respondent must prove that petitioner acted with the specific intention of evading a tax believed to be owing. Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). "The mere fact that a taxpayer is unable to prove that the Commissioner's deficiency assessments are erroneous, even if a number of taxable years are involved, is not sufficient to sustain the burden of proving fraud." Biggs v. Commissioner,440 F.2d 1, 5 (6th Cir. 1971), affg. a Memorandum Opinion of this Court. Respondent proved that HEI failed to report specific items of its income in substantial amounts for each of the years 1956 through 1962 -- $7,414.50 from 4-I in 1956; $3,737.50 from 4-I and $527.85 from interest in 1957; $5,175 from Republic Steel Corporation in 1958; $3,709.50 from 4-I and $5,375 from Weirton Steel Company *417 in 1959; $138,000 from Republic Steel Corporation and $3,845 from 4-I in 1960; $32,500 from Weirton Steel Company, $5,935 from 4-I, $4,240 from Eaton Manufacturing Company, and $1,715 from Tyson Bearing Company in 1961; and $27,000 from Algoma Steel Corporation, Ltd., $15,103 from 4-I, and $8,812.50 from Eaton Manufacturing Company in 1962, as well as other amounts referred to in our findings of facts. Respondent has proved that HEI channeled considerable amounts of its income to Dr. and Mrs. Kopas either without making the usual business records in connection with those transactions or making inaccurate and misleading records of them. We refer, particularly, to HEI's customers' checks diverted to the Kopases without being recorded on HEI's books or recorded as being loans and advances from Dr. Kopas. Respondent has also proved that, in each of the years 1956 through 1962, HEI paid substantial amounts of its funds to and for the personal benefit of Dr. and Mrs. Kopas, again either without making the usual business records in connection with such payments or making inaccurate and misleading records of them. We have in mind, particularly, the purchase by Dr. Kopas of coins with HEI *418 funds in each of those years; the payment of Dr. Kopas' life insurance premiums in 1956, 1960, and 1961; the payments HEI made in 1957, 1958, 1959, 1960, and 1962 on account of the purchase by Mrs. Kopas of real estate in Niles, Ohio; and the payments HEI made for their children's education and expenses in 1959, 1960, 1961, and 1962, as well as the other personal expenses of Dr. and Mrs. Kopas referred to in our findings of fact. Such direct circumstantial proof and the reasonable inferences drawn from them, see Stone v. Commissioner,supra;Otsuki v. Commissioner,53 T.C. 96 (1969), coupled with the facts that its officers, Dr. and Mrs. Kopas, are highly educated people and that Mrs. Kopas is trained in accounting, clearly and convincingly establish that HEI deliberately conducted its financial affairs and made (and did not make) financial records in such a manner as to conceal essential information as to its receipts, disbursements, and actual income with intent to evade taxes which it believed it owed, and that the return which it filed for each of the years 1956 through 1962 was false and fraudulent with intent to evade tax. See Estate of Temple v. Commissioner,67 T.C. 143 (1976). *419 The statute of limitations does not bar assessment of HEI's tax for any of the years before us. Issue 3. Taxable income of Human Engineering Institute
Respondent's determination of HEI's tax deficiencies is presumptively correct and the burden rests upon the taxpayer to show that it is erroneous. Welch v. Helvering,290 U.S. 111, 115 (1933); Biggs v. Commissioner,supra at 5; Rule 142, Tax Court Rules of Practice and Procedure. Within the limits of our powers, the Court gave petitioner ample opportunity to make such proof as it might have. Nevertheless, the evidence adduced by petitioner on this score related only to respondent's failure to take into account for 1955, and his partial disallowance of the expenses set forth on its returns for the years 1956 through 1962, expenses for leasehold improvements and rental payments. HEI leased property from Dr. and Mrs. Kopas commencing in 1955. Respondent contends that many of the improvements to the properties made by HEI were of a capital nature and must be depreciated rather than expensed. Respondent's computations take such depreciation as respondent deems proper into account in *420 respect of the substantiated and disallowed expenditures for those capitalized leasehold improvements. Petitioner argues that under the terms of each of the leases relating to these properties it was responsible for all alterations, repairs, upkeep, and maintenance to the building and premises and that such capital expenditures as it made were made for its particular purposes and, accordingly, it should be allowed to deduct such costs. Respondent is correct. It has been clear, at least since Duffy v. Central R.R.,268 U.S. 55 (1925), that expenditures which are made, not to keep the properties going, but to create additions to them, which constitute, not upkeep, but investment -- not maintenance or operating expenses, but capital -- are not deductible in the year paid but must be depreciated. This is true even though the betterments in question may not have materially prolonged the life of the building but merely rendered it better suited to the lessee-petitioner's purpose. Alexander Sprunt & Son, Inc. v. Commissioner,24 B.T.A. 599, 619 (1931), affd. in part and revd. in part on other issues 64 F.2d 424 (4th Cir. 1933). To be sure, *421 some part of the expenses questioned may have been for ordinary repairs which may be deducted from gross income; however, the record affords no basis for a segregation of these items from those of a capital nature and, consequently, we cannot determine what part of the amounts not allowed is a proper deduction. HEI has simply failed to carry its burden of proof on this question. [11]
Although the point was not directly raised by HEI, we do not believe that the period over which respondent has allowed depreciation of these improvements is incorrect. The general rule is that where a lessee makes improvements on leased property which have estimated useful lives longer than the original term of the lease, the lessee is entitled to depreciate or amortize the cost of the improvements over the remaining term of the lease, unless the facts show with reasonable certainty that the lease will be renewed. Secs. 1.162-11(b) and 1.167(a)(4), Income Tax Regs. This Court and others have held that *422 where there is a reasonable certainty that the lessee will continue to occupy the leased premises for an indefinite period beyond the stated term of the lease, the lessee must depreciate the cost of improvements over their estimated useful lives, determined without regard to the term of the lease. E.g., G.W. Van Keppel Co. v. Commissioner,295 F.2d 767 (8th Cir. 1961); Highland Hills Swimming Club, Inc. v. Wiseman,272 F.2d 176 (10th Cir. 1959); Theodore v. Commissioner,38 T.C. 1011 (1962); Morris v. Commissioner,38 T.C. 279 (1962). We so conclude here. The question of whether the leases are in substance of definite or indefinite duration is a question of fact to be determined in the light of all the pertinent circumstances. G.W. Van Keppel Co. v. Commissioner,supra at 771; Highland Hills Swimming Club, Inc. v. Wiseman,supra at 179; see Whichita Terminal Elevator Co. v. Commissioner,162 F.2d 513 (10th Cir. 1947). Although the leases in question were for 33 or 36 month terms and contained no expressed renewal rights, the Kopases' unity of interest as *423 individual lessors and as the efferent nerve of HEI, the lessee, makes it clear that HEI would be a tenant of the properties as long as it was advantageous to the Kopases."And the continuance as long as it is advantageous is, of course, characteristic of an indefinite lease." Highland Hills Swimming Club, Inc. v. Wiseman,supra at 180. The entire conduct of the Kopases vis-a-vis HEI makes it clear that it was in the Kopases' interest to keep HEI operating and expanding as long as possible. The unlikelihood of termination of the leases at the end of any 33 or 36 month term is further shown by the fact of the substantial expenditures for what Dr. Kopas, himself, referred to as "specific purpose improvements" to the buildings; i.e., an integral part of HEI's operations. It is not realistic to believe that such extensive expenditures would be made for "specific purpose improvements" unless it was understood that the property would continue to be used for that purpose for more than 3 years. For the above and other reasons appearing in the record, we believe petitioner was occupying each of the premises in the years in question for a period of indefinite duration. *424 The improvements must be depreciated over the period of their useful lives, and petitioner furnished no evidence that respondent's determinations of the amounts of allowable depreciation are in error. As for the disallowed rental expenses: The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. * * * When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. Place v. Commissioner,17 T.C. 199, 203 (1951), affd. 199 F. 2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953), quoted with approval, Mackinac Island Carriage Tours, Inc. v. Commissioner,455 F.2d 98, 100 (6th Cir. 1972). Respondent made his determinations of allowable rental deductions on the basis of a 6% return to the owners on the cost of *425 the properties. The costs to HEI of insurance and real estate taxes and depreciation on improvements were also allowed.Petitioner argues that respondent's figures are unreasonable and that it relied on advice it received from the Internal Revenue Service as to what reasonable rent would be. The close relationship between the lessor-petitioners, Kopas, and the lessee-petitioner, HEI, is clearly established and there is no evidence of arm's length dealing between them relative to the properties in question. We cannot say on this record that the allowance by respondent of a 6% net return to the owners on the cost of the buildings is arbitrary or unreasonable, and petitioner has not adduced any evidence to show either that the sums it paid or some other sums in excess of those allowed by respondent should be treated as having been paid for the use of the property. Petitioner claims that, before it decided on the rentals to be paid, it went to the Internal Revenue Service -- to a man named Mr. Mitchell, who dealt with nonprofit organizations -- to determine what an arm's length rental would be. Dr. Kopas testified, further, that Mr. Mitchell called three different management firms *426 that managed buildings such as the Kopases' and determined that a reasonable rent would be $2.75 a square foot and the Kopases and HEI then based the rent on $2.25 a square foot. Dr. Kopas' explanation was vague as to why, after $2.75 a square foot was determined to be a fair rental, $2.25 was the figure used. That inconsistency sheds some doubt on his entire testimony in this regard. But, more significantly, there is no way to know on the record here whether such rental was based on truly comparable properties, or even whether $2.75 a square foot was a fair rental under a ne-net lease, or what, if any, expenses in addition to the rental payments the tenant would be responsible for at that rate. In any event, the law is well settled that respondent is not bound by erroneous advice given by his revenue agents. Darling v. Commissioner,49 F.2d 111, 113 (4th Cir.), cert. denied 283 U.S. 866 (1931); Fortugno v. Commissioner,41 T.C. 316, 323-324 (1963), affd. 353 F.2d 429 (3rd Cir. 1965). The fact remains that HEI has totally failed to show that the rent it paid for each of the properties was not "in excess of what the *427 lessee would have been required to pay had * * * [it] dealt at arm's length with a stranger," or that the amounts of rental payments disallowed were not in truth disguised distributions of income by HEI to its moving forces, Dr. and Mrs. Kopas. We hold for respondent on this question. Because petitioner HEI has failed to carry its burden of proof as to any element of the proposed tax deficiencies for any of the years in issue, respondent's determinations in that regard are sustained. Issue 4. Human Engineering Institute's liability for the 50 percent addition to tax for fraud
Respondent proposes to assess a 50 percent addition to tax for fraud under section 293(b) of the Internal Revenue Code of 1939 for the year 1953 and section 6653(b) of the Internal Revenue Code of 1954 for each of the subsequent years involved. Respondent must be sustained in respect of each year as to which he has proved by clear and convicing evidence that any part of the deficiency was due to fraud. In sustaining the burden of proof, respondent is not required to prove the precise amount of the underpayment resulting from fraud, but only that "any *428 part" of the underpayment is attributable thereto.Buggs v. Commissioner, supra; Estate of Brame v. Commissioner,25 T.C. 824 (1956), affd. 256 F.2d 343 (5th Cir. 1958) (per curiam). As we have set forth under Issue 2, above, a part of the underpayment for each of the years 1956 through 1962 was due to fraud, and we sustain the 50 percent addition to tax under section 6653(b) as to each of those years. As for 1953, however, respondent has not carried his burden of proof, and the 50 percent addition to tax under section 293(b) of the Internal Revenue Code of 1939 cannot be sustained. HEI was incorporated in 1952, and respondent has not shown that that was done with intent to evade taxes. HEI deposited all of the funds it received in 1953 in its own account at the Central National Bank. To be sure, in that year two of HEI's checks were written to and deposited in the account of Dr. Kopas doing business as PTC. Nevertheless, those checks were for a relatively small amount in the aggregate -- $2,425 -- and, at least by way of a question he asked at the trial, Dr. Kopas has suggested that that amount was paid by HEI for supplies. *429 Respondent has not proved that it wasn't. [12] The only other indication of fraud, the failure of petitioner to file any return for 1953, does not, alone, carry the day for respondent. Marsellus v. Commissioner,544 F.2d 883 (5th Cir. 1977), affg. a Memorandum Opinion of this Court; First Trust & Savings Bank v. United States,206 F.2d 97 (8th Cir. 1953); Beaver v. Commissioner,55 T.C. 85 (1970). We hold for petitioner on this issue for that year. On the other hand, respondent has carried his burden of proof as regards 1954 and 1955. In 1954, an $875 check of Republic Steel Corporation was not deposited to HEI's account. The amount is small, and respondent has not shown what its disposition was. Certainly, standing by itself *430 it would not be sufficient to carry the day for respondent on this issue. However, in 1954, HEI started to pay for coins purchased by Dr. Kopas and issued its checks in the aggregate amount of $3,281 for that purpose that year. Checks to PTC and MPC were cahsed after being endorsed by Dr. Kopas. The evidence in its totality, including HEI's failure to file any return and the absence of an explanation for the payments to Dr. Kopas and for his benefit and as to why some of the checks were cashed, makes reasonable the inference that HEI was, as early as 1954, diverting income and disguising payments to Dr. Kopas in substantial amounts in such a manner as to conceal them with intent to evade its (HEI's) taxes. In 1955, Republic Steel Corporation checks in the aggregate amount of $33,246 were not deposited in HEI's account. In 1955, HEI paid more than $7,000 for coins purchased by Dr. Kopas and over $2,100 for a life insurance premium on a policy insuring and owned by Dr. Kopas. One of Republic Steel's checks, an HEI check to MPC, and 3 HEI checks to PTC were issued that year in part payment of the purchase price for the 2074 East 36th Street property acquired in the name of PTC. *431 In 1961, when he was asked by Revenue Agent Bender where the purchase money for his and Mrs. Kopas' real estate came from, Dr. Kopas told Bender that it had come from the redemption of savings bonds, withdrawal from savings accounts, various loans, and the sale of coins -- not mentioning HEI. It is clear to us on the basis of respondent's convincing evidence, including petitioner's failure to file any return for 1955, that, in 1955, HEI deliberately conducted its financial affairs and made (and failed to make) financial records in such a manner as to willfully and knowingly conceal essential information as to its recipts, disbursements, and actual income with intent to evade taxes which it believed it owed. The 50 percent addition to HEI's taxes for each of the years 1954 through 1962 is sustained, but not for 1953. Issues 5 and 6. Statute of limitations on assessments against Joseph S. and Mary E. Kopas and their liability for the 50 percent addition to tax for fraud
Inasmuch as the notice of deficiencies was mailed more than 3 years after the filing of petitioners Dr. and Mrs. Kopas' returns for the years in issue, assessment of the deficiency in respect of each *432 of those years is barred unless the returns were false or fraudulent within the contemplation of section 276(a) of the Internal Revenue Code of 1939 (for 1953) and section 6501(c)(1) of the Internal Revenue Code of 1954 (for the years 1954 through 1962). Additionally, if the returns were fraudulent, the penalty provided by section 293(b) of the Internal Revenue Code of 1939 (for 1953) and section 6653(b) of the Internal Revenue Code of 1954 (for the years 1954 through 1962) is applicable. As we pointed out, above, in connection with HEI, the existence of fraud is a question of fact which must be ascertained by an evaluation of all the facts of the case. It consists of an intentional wrongdoing designed to evade a tax believed to be owing. The burden of proof is on respondent to prove the existence of fraud by clear and convincing evidence. Moreover, respondent must make the required showing with respect to each year in question; proof of fraud for one year will not sustain the respondent's burden of proving fraud in another year. The mere presumption of correctness of respondent's determination *433 as to petitioners' deficiencies is not sufficient to sustain respondent's burden of proving fraud. In sustaining the burden of proof, respondent is not required to prove the precise amount of the underpayment resulting from fraud, but only that "any part" of the underpayment is attributable thereto. See, also, Jackson v. Commissioner,380 F.2d 661, 664 (6th Cir.), cert. denied 389 U.S. 1015 (1967), affg. a Memorandum Opinion of this Court.
Dr. Kopas was convicted, on his plea of guilty, of having willfully and knowingly attempted to evade his federal income tax for 1961, and he is estopped to deny his fraud as to that year. Arctic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964); see also Amos v. Commissioner,360 F.2d 358 (4th Cir. 1965), affg. 43 T.C. 50 (1964). A substantial omission or understatement of income, together with a pattern or repetition over a period of years, although not conclusive, in the absence of explanation may be considered as strong evidence of fraud. See Holland v. United States,348 U.S. 121 (1954); Kurnick v. Commissioner,232 F.2d 678 (6th Cir. 1956); *434 Rogers v. Commissioner,supra. The record in this case is replete with specific instances where items of income were repeatedly omitted from petitioners' returns. See Foster v. Commissioner,487 F.2d 902 (6th Cir. 1973), affg. a Memorandum Opinion of this Court. Dr. and Mrs. Kopas substantially understated their interest income in 1953, 1955, 1959, and 1962 and to a lesser extent in 1956, 1957, 1958, 1960, and 1961. They failed to report the sales of coins in 1954 through 1962. They failed, totally, to explain the large discrepancy between the amount deposited in their bank account which Dr. Kopas maintained in the name of PTC at the Cleveland Trust Company and the amount they reported as income in each year. They failed to report any of the substantial amounts paid to them and expended for their benefit by HEI and MPC in each of the years 1954 through 1962. In this regard, the statement Dr. Kopas made to Revenue Agent Bender to the effect that Dr. and Mrs. Kopas acquired their real estate with their own resources -- without mentioning HEI -- reflects Dr. Kopas' consciousness of guilt. The consistent failure of petitioners to report items *435 of income, coupled with the facts that they are highly educated individuals and that Mrs. Kopas is trained in accounting, kept the books of HEI, and actively participated in the attempted deceptions, leads us to conclude unequivocally that both petitioners were aware of the proper reporting requirements, but, in each year in issue, voluntarily and intentionally violated a legal duty known to them. See United States v. Pomponio,429 U.S. 10 (1976) (per curiam). The return which they filed for each of the years in issue was false and fraudulent with intent to evade tax and a part of the underpayment of their tax for each year was due to the fraud of each of the petitioners Joseph S. and Mary E. Kopas. The statute of limitations does not bar the assessment of the tax for any of the years in issue, and the 50 percent addition to tax for fraud in respect of each year is sustained. Issue 7. Gross income of Joseph S. and Mary E. Kopas
Respondent's determinations as to Dr. and Mrs. Kopas' unreported income and other adjustments to income are presumptively correct and the burden rests upon the taxpayer to prove them erroneous. Welch v. Helvering,supra; *436 Biggs v. Commissioner,supra at 5; Rule 142, supra. Again, within the limits of our powers, we gave petitioners ample opportunity to make such proof as they might have, but petitioners chose to adduce evidence only as to the cost of the coins they sold and the attribution to them of income from leasehold improvements to their properties. [13]
Respondent determined that petitioners Dr. and Mrs. Kopas realized certain sums from the sale of coins in each of the years 1954 through 1962. In respect of each of those years, respondent took the position in his notice of deficiency that, in the absence of evidence of petitioners' allowable basis or of their holding period, petitioners were taxable on the gross amount determined to have been realized, as short-term capital gain. *437 In his testimony, Dr. Kopas admitted that he failed to report his income from the sale of coins. [14] Furthermore, petitioners introduced no evidence to contradict respondent's determinations of the amounts realized in each year from the sale of coins or, except in very general terms, the holding period of the coins sold in any year. Nevertheless, they maintain that the cost of the coins must be taken into account in determining the amounts of their taxable gains. The problem is that petitioners have no direct proof of the cost or other basis of the coins sold. After the notice of deficiency was issued, Dr. Kopas attempted to reconstruct the basis of some of the coins, those allegedly given to Mrs. Kopas by an uncle in the 1920s, either from markings on the envelopes in which they had been contained or appraisals made from their descriptions, but the product of his attempts was of no value as probative *438 evidence. Still, petitioners' point that the coins did have some basis in their hands is well taken. On the basis of the facts which we do have, the conclusion that they must have had some cost or other basis is inescapable. Indeed, respondent has increased petitioners' income substantially in each of the years 1954 through 1962 on account of expenditures of HEI and MPC funds by Dr. Kopas to purchase coins. Not to allow some of that amount to reduce gross receipts in determining the gain petitioners realized from the sales of coins would clearly result in the unwarranted duplication of a great deal of taxable income. This is so, particularly, inasmuch as respondent has treated all of the gains from the sales of coins as short-term capital gains, thereby adopting, albeit indirectly, the proposition that the acquisitions and dispositions of the coins took place within relatively short periods. On the record as a whole, but keeping in mind that the scanty data available to us results from petitioners' own failure to keep contemporaneous accounts relative to coins bought and sold, we find that the coins sold by petitioners in each of the years in issue had a basis in their hands *439 equal to 75% of the amounts they realized from such sales, and we hold that the amount of short-term capital gain from the sales of coins as determined by respondent shall be reduced by that percentage in each of the years 1954 through 1962. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930); See Reeves v. Commissioner,314 F.2d 438 (6th Cir. 1963), affg. a Memorandum Opinion of this Court. Respondent determined that the expenses paid by HEI and Republic Steel Corporation for improvements to petitioners Dr. and Mrs. Kopas' properties constitute additional income to Dr. and Mrs. Kopas in the years paid. HEI was a tenant of the properties in question, and the general rule is that a lessor does not derive taxable income at the time of construction of leasehold improvements by the lessee. M. E. Blatt Co. v. United States,305 U.S. 267 (1938). We would certainly apply that rule here if we could find that the expenditures in question were in fact and in substance made by HEI "pursuant to bona fide business transactions, all at arm's length * * *." Bardes v. Commissioner,37 T.C. 1134, 1149 (1962). Such, however, is not *440 the case. Again, similar to the rental payments question discussed under Issue 3, above, the issue here is whether the payments were something else paid under the guise of leasehold improvements. Jaeger Motor Car Co. v. Commissioner,284 F.2d 127 (7th Cir. 1960), cert. denied 365 U.S. 860 (1961), affg. a Memorandum Opinion of this Court. The entire conduct of the Kopases vis-a-vis HEI make it clear that HEI assets were utilized to enhance the wealth of Dr. and Mrs. Kopas in whatever clandestine ways they believed that might be accomplished without disclosure. The improvements made to Dr. and Mrs. Kopas' properties by HEI have not been shown by petitioners to have been outside that modus vivendi. As for the improvements paid for by Republic Steel Corporation, there is no evidence that they did not create an immediate and direct accession to wealth by the Kopases through increasing the value of their property. We sustain respondent's determinations on this question. Issues 8 and 9.Disallowed deductions and dependency exemptions
Despite being given ample opportunity to do so, petitioners failed to put into evidence any testimony or documents *441 to controvert respondent's presumptively correct determinations as to the allowable amounts of deductions for business expenses, charitable contributions, interest, taxes, and the dependency exemption claimed in respect of petitioners' son Robert. In each instance, deductions were disallowed as being unsubstantiated and petitioners did not substantiate them in these proceedings. Inasmuch as petitioners have failed to meet their burden of proof, the Court must sustain respondent on the disallowance of these items as set forth in the notice of deficiencies. Welch v. Helvering,supra;Biggs v. Commissioner,supra;Rule 142, supra. * * *
In accordance with the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The early history of the case is set forth in Human Engineering Institute v. Commissioner,61 T.C. 61 (1973), appeal dismissed, C.A. 6, Apr. 1, 1975, cert. denied     U.S.     (Oct. 6, 1975). See also Kopas v. United States, an unreported case ( N.D. Ohio 1973, 32 AFTR 2d 73-5111, 73-1 USTC par. 9466), affd.     F. 2d     (6th Cir. 1974, 33 AFTR 2d 74-884, 74-1 USTC par. 9325); Human Engineering Institute v. Abbott,     F. Supp.     ( N.D. Ohio 1977, 40 AFTR 2d 77↩-5978, 77-2 USTC par. 9671). 2. The notice and demand in respect of the jeopardy assessment herein was made on September 7, 1967, and the notices of deficiency were issued on November 3, 1967.↩
3. Included in the same category is petitioners' attempt to have the Court serve subpoenas on witnesses and pay witness fees. We are constrained to note in this connection that petitioners chose not to attempt to obtain at least one witness who was available in Cleveland (where the trial was held) simply because they did not want to ask him to give up a day's work, which they equated with a day's pay.↩
4. The shifting of the burden of proof is not involved in the additions to tax for fraud, since respondent already has the burden of proof as to this issue. See section 7454(a), I.R.C. 1954; Rule 142(b), Tax Court Rules of Practice and Procedure.↩
5. See also Amato v. Commissioner,T.C. Memo. 1977-305↩, and cases cited therein. 6. In this connection, we note that it was petitioners who of their own volition peremptorily decided to terminate the trial before the Special Trial Judge.↩
7. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
8. Each petitioner's taxable year is the calendar year.↩
9. See further discussion, below, regarding the purchase in 1955 of certain real estate by Dr. Kopas doing business as Personnel Test Company from Richard Hawley Cutting & Associates, Inc.↩
1. After applicable dividend exclusion, if any. ↩
2. Personnel Test Company. ↩
3. After application of capital loss carryover and long-term capital gain deduction, if any. ↩
4. After sick pay exclusion of $600.↩
10. See footnote 12, infra,↩ and text thereat, regarding payments totalling $2,425 made by HEI to PTC in 1953.
11. The one item specifically brought to the Court's attention by petitioner -- the payment in 1956 of $567.59 to one Arthur Anielski for aluminum screens and awnings -- is a capital expenditure.↩
12. The fact that respondent did not prove that these expenditures were not for supplies does not mean that these items will not be treated as a distribution of earnings from HEI to the individual petitioners, disallowed as deductions to HEI, or not included in the individual petitioners' income. This is one of those instances in which each party has failed to carry his respective burden of proof.↩
13. In consideration of the fact that petitioners appeared pro se, we do not treat either of these points as having been waived, despite an express waiver of the cost-of-coins-sold issue at trial and the fact that neither issue was squarely dealt with in petitioners' briefs. To treat the points as waived could result in an appallingly harsh result, which we are unwilling to approve.↩
14. "Mr. Sowards [respondent's counsel]: * * * Isn't it true that you did not report any coin sales on any of your federal income tax returns from 1954 to 1962? "Dr. Kopas: That is true. And it's unfortunate. I should have." (Transcript of proceedings; June 22, 1976, p. 261.)↩